CONSOLIDATED MOTOR LINES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 2043. Promulgated May 17, 1946.

*Sidney L. Cramoy, Esq.*, and *Harry Janin, C. P. A.*, for the petitioner.

*J. T. Haslam, Esq.*, for the respondent.

DISNEY, *Judge*: This case involves income tax and excess profits tax for the calendar year 1940. The Commissioner determined a deficiency of $5,396.02 in income tax and $16,257.52 in excess profits tax. The petition sets up a claim of $2,522.26 overpayment of income tax and $4,500 overpayment of excess profits tax. Some of the issues have been conceded and another settled by stipulation, all of which will be reflected in decision under Rule 50. This leaves for consideration the following issues: (1) Whether the Commissioner erred in including in petitioner's income $7,579.43 charged by the petitioner to expense in previous years in excess of the proper amount; (2) whether petitioner's income for the base period year 1938 should be increased (and therefore excess profits credit increased) by disallowance of deduction of $10,959.85 interest, which petitioner contends was abnormal; (3) whether excess profits net income for the base period year 1938 should be increased by disallowance of expenses claimed as abnormal as caused by a hurricane; and (4) whether

excess profits net income for the base period years 1936–1939 should be increased by disallowing uncompensated expenses claimed as losses from fire, rain, collision, accident, and theft. Some of the facts were stipulated. We find them to be as so stipulated. They will, so far as considered necessary for consideration of the issues, be set forth with other facts found from evidence adduced in our findings of fact.

FINDINGS OF FACT.*

General Facts.

The petitioner is a corporation, organized in 1930 under the laws of Connecticut. It filed its Federal income and excess profits tax returns with the collector at Hartford, Connecticut. It paid $4,500 on excess profits tax on March 15, 1941, at time of filing tentative income, declared value excess profits, and defense tax return, also tentative excess profits tax return; and on September 15, 1941, it filed a claim for refund of that amount at the time of filing amended excess profits tax return. Final income, declared value excess profits tax, and defense tax return had been filed April 15, 1941.

Petitioner's books were kept, and its returns filed, upon an accrual method and a calendar year basis, at all times herein material. Petitioner's excess profits credit, based upon income, exceeds excess profits tax credit based upon invested capital.

The petitioner was at all times material here a common carrier of freight, by motor, engaged in transportation in Massachusetts, Connecticut, Rhode Island, New York, New Jersey, and parts of Pennsylvania. It operated under franchises granted by the Interstate Commerce Commission and by public utilities commissions in various states, and carried what are called "commodities in general."

In the notice of deficiency the respondent determined petitioner's excess profits net income for the years 1936 to 1940, both inclusive, to be as follows:

| | |
|---|---|
| 1936 (loss) | $30,498.83 |
| 1937 (loss) | 127,886.91 |
| 1938 | 80,748.53 |
| 1939 | 58,113.61 |
| 1940 | 148,604.89 |

I.—Facts as to Interest Expense Abnormality.

The petitioner had, and deducted, expenses for interest as follows: 1934, $6,027.32; 1935, $2,671.96; 1936, $7,915.23; 1937, $29,872.98; 1938, $27,861.74; 1939, $20,899.38; 1940, $16,901.89.

The interest expense of $27,861.74 in 1938 was, in the computation of taxable net income, deducted from gross income. The $27,861.74

---

*The facts on each issue (except general facts) will be set forth separately, followed by the opinion on that issue.

exceeds 125 percent of the average interest deduction for 1936–1939, inclusive, by $13,334.40, and exceeds the interest deduction for 1940 by $10,959.85. Of the $27,861.74, the sum of $25,376.03 was interest on equipment obligations, $1,616.80 was interest on stockholders' loans, $484.82 was interest on trade purchases, and $384.09 was interest on tax assessments.

As of December 31, 1935, 1936, 1937, and 1938, petitioner's total current assets and total current liabilities were:

| | 1935 | 1936 | 1937 | 1938 |
|---|---|---|---|---|
| Tota. current assets | $135,488.36 | $318,103.76 | $254,539.75 | $381,253.97 |
| Total current liabilities | 240,355.33 | 386,998.61 | 626,826.94 | 652,300.82 |

Petitioner purchased equipment on credit, on conditional sales contracts providing for monthly amortization over periods of 18 to 36 months, with interest at 6 percent per annum. Interest expense on obligations for equipment was as follows: 1934, $2,517.50; 1935, $1,609.18; 1936, $6,821.15; 1937, $29,872.98; 1938, $25,376.03; 1939, $19,332.44; 1940, $16,654.87. Of the interest accrued in 1938, the sum of $11,907.77 was for equipment purchased between January 1, 1936, and June 19, 1937.

The motor vehicle account on petitioner's books showed a balance of $238,111.06 on January 1, 1936, and of $232,981.04 on June 19, 1937. The equipment purchased between the two dates was in the main for replacement of obsolete and outworn equipment and replacement of old equipment with lower-cost, possibly better, equipment.

For 1937 petitioner's gross operating revenue was $2,697,529.02, operating costs were $1,851,577.69, and net operating revenue was $845,951.33. For January 1 to November 5, 1938, gross operating revenue was $3,090,607.68, operating costs were $1,891,670.11, and net operating revenue was $1,198,937.57. In 1937 cargo hauled by petitioner was 615 million pounds, and it was 645 million pounds for the first 44 weeks of 1938.

Petitioner purchased equipment on credit because it did not have capital to buy it. It paid interest to stockholders upon loans used for working capital, the loans being incurred as follows: $19,500 on December 31, 1937, $11,000 on January 29, 1938, and $2,000 on April 23, 1938.

OPINION.

The petitioner contends for adjustment of its base period income by an abnormality in interest expense of $10,959.85 as to 1938, based upon an average interest deduction of $11,621.87 for the base period years 1934–1937, inclusive, of which 125 percent would be $14,527.34, and a deduction for 1938 of $27,861.74, making a difference of $13,334.40,

the abnormality being limited, however, to the difference between $16,901.89, the deduction for 1940, the taxable year, and the 1938 deduction of $27,861.74—which gives the $10,959.85. The applicable statute, section 711 (b) (1) (J) and (K) (ii) of the Internal Revenue Code, is set forth in the margin.[1] No contention is made as to the accuracy of the above figures, and it is not contended that the deduction was abnormal as to class, but only in amount, and the abnormality in amount appears on the face (above 125 percent of the average for the four previous taxable years) so that our only question is whether the petitioner has made the showing required by subsection (K) (ii). The petitioner contends that it has done so, that is, has shown that the abnormality or excess in the 1938 interest deduction was not the consequence of an increase in gross income, or of a decrease in the amount of some other deduction, or of a change at any time in type, manner of operation, size, or condition of its business. There appears no contention that the abnormality was due to decrease in any other deduction; in any event, we hold that it was not. The argument is, first, whether petitioner has shown it was not consequence of increase in gross income. To meet this burden the petitioner showed that, of the $27,861.74 deducted for interest in 1938, $25,376.03 was interest on equipment purchases; that due to lack of capital, it was necessary to buy equipment on credit and, therefore, incur the interest; and it argues that, therefore, the abnormality did not arise from increase in gross income or, generally stated, change in the business. It is pointed out that working capital was borrowed from stockholders.

---

[1] SEC. 711. EXCESS PROFITS NET INCOME.

\* \* \* \* \* \* \*

(b) TAXABLE YEARS IN BASE PERIOD.—

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made (for additional adjustments in case of certain reorganizations, see section 742 (E)) :

\* \* \* \* \* \* \*

(J) Abnormal Deductions.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination, for the purposes of this subparagraph, of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

(ii) If the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

(K) Rules for Application of Subparagraphs (H), (I), and (J).—For the purposes of subparagraphs (H), (I), and (J)—

\* \* \* \* \* \* \*

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

In *William Leveen Corporation*, 3 **T. C.** 593, relied upon by both parties, we considered the statutes and question here presented, except that bad debt instead of interest was involved. We said that, since the bad debt abnormality for 1939 was about $10,000, and the gross income for 1939 was about $17,000 above the average for the three previous years, "mathematically therefore the two increases may reasonably be regarded as having relation to each other— * * * the taxpayer's success depends upon proof that it was not," and we held that the taxpayer had not met the burden.

Here, the petitioner has not shown the gross income for the base period. The respondent, however, it is stipulated, determined the excess profits net income of the petitioner for 1936 to be $30,498.83 (loss, the same figure reported by petitioner as normal tax net income) ; for 1937 to be $127,886.91 (loss, same figure reported by petitioner as normal tax net income) ; and for 1938 to be $80,748.53. If we apply the reasoning of the *William Leveen* case, the increase in interest deduction "is coincident with and therefore related to the contemporaneous increase in gross income"—assuming that the excess profits net income, in absence of showing of gross income, shows the same tendency. Moreover, the operating revenue and operating expenses for and amount of cargo hauled in the years 1937 and 1938 indicate a great growth in the business, commensurate in general with increased deduction for interest. The petitioner, however, contends that, since the interest was incurred, i. e., the agreements to pay were made, in 1936 and 1937, and were being reduced in 1938, the interest deduction was no consequence of increase in gross income.

In our opinion, the *Leveen Corporation* case is distinguishable, for there the bad debt involved was incurred and charged off in the same year. Therefore, it was logical to find relation between increase in gross income and increase in bad debts, while here, the interest being contracted for in previous years, such relation between gross income and interest in the year involved is lacking.

However, we do not think the petitioner has demonstrated the abnormality sought to be shown. The general object of the statutes involved is to level out abnormalities in the base period, which means that we consider only abnormal elements. The petitioner suggests such an element in the lack of capital, causing borrowing in an abnormal amount compared with other years, and that it has, therefore, made the showing required by section 711 (b) (1) (K) (ii). But is lack of capital an abnormal element or cause of borrowing demonstrating the negative demanded by that section? The contrary would appear, for it seems obvious that lack of capital is the ordinary cause of borrowing. This seems to go to the basic reason for the statutes here examined. The fact, of which borrowing must be shown the con-

sequence to make the showing under section 711 (b) (1 ) (K) (ii), appears to us to be the reason for the insufficiency of capital, not merely such insufficiency. The statute speaks of consequences, not proximate causes. The petitioner must show that the interest was not paid as a consequence of change in size of the business (among other requirements) and absence of consequence from this change "at any time" must be proven. This, in our view, petitioner has not done. It points out that the borrowing was upon terms of from 18 to 36 months, and from that fact it says that the interest paid in 1938 was an obligation incurred from the beginning of 1936, that there was no increase in size of the business from that date, and, therefore, that borrowing was not caused by such increase. The error in this argument is that there is no proof that there was no increase "at any time," that is, prior to January 1, 1936, and that, because on the evidence some of the obligations for the equipment involved were for 3 years, some part, perhaps a considerable part, of the interest paid in 1938 was incurred in 1935 (instead of 1936, as petitioner argues), at which time there may have been, and on the evidence appears to have been, an increase in the size of the business. Since the evidence is that, of the interest paid in 1938, $11,907.77 was on purchases of equipment from January 1, 1936, to June 19, 1937, it is apparent that some considerable portion may have been incurred in 1935. Contracts for equipment made after January 1, 1935, on a 36-month basis would of course be drawing interest until some date after January 1, 1938, so the borrowings during all of 1935 are subject to the question, unanswered, whether they were in a 36-month basis so as to be the cause of interest paid in 1938, the year here crucial. But we have no evidence that such borrowings in 1935 were not due to increase in size of the business. We are furnished the amount of the motor account at January 1, 1936, and also the amount thereof at June 19, 1937, showing about $6,000 decrease. But we are not shown whether the motor account increased in 1935, or, if so, how much. On the other hand, the evidence does indicate that interest deductions in 1936 (on petitioner's theory, apparently on loans earlier incurred) were almost 3 times as much as in 1935 ($7,-915.23 as against $2,671.96 in 1935), and, as to equipment, $1,609.18 in 1935 against $6,821.15 in 1936—more than fourfold increase. The evidence is that equipment was purchased on credit prior to 1936; therefore, it appears probable that equipment purchases, as to years causing interest payments reflected in 1935 and 1936, increased very greatly. On the record before us, we can not say that the abnormality above average in interest accrued in 1938 was not consequence of increase "at any time" in size of business, so far as interest paid for equipment is concerned. Moreover, the proof was largely confined to the equipment.

On the other items, stockholders' loans, trade purchases, and tax assessments, totaling $2,485.71, no showing was made to satisfy section 711 (b) (1) (K) (ii). These items, except $1,616.80 on stockholders' loans, were not shown incurred for lack of capital, or not because of change in size, or condition of business. The proof was that the stockholders' loans began on December 31, 1937, with a loan of $19,500, the others being $11,000 on January 29, 1938, and $2,000 on April 23, 1938. The fact that these loans started practically with the year 1938 indicates that the petitioner stresses too much the fact of stockholders' loans as indicative of dearth of capital when equipment was purchased much earlier. The only fact proven with reference thereto is the fact of the loans. Plainly, the proof does not satisfy the requirements of section 711 (b) (1) (K) (ii). We hold that the petitioner has failed to demonstrate error on the part of the Commissioner as to the interest paid in 1938.

## II.—Hurricane Loss Alleged.

### FINDINGS OF FACT.

On September 21, 1938, a severe hurricane struck the northeastern part of the United States, including in part the region in which the petitioner operated. There was excessive rain, and tidal waves swept up the rivers, inundating areas and cities. The high winds caused many trees, telegraph poles, and power lines to fall over the highways. City streets on that account became impassable. Many key bridges were washed out, making it impossible to traverse some key highways. Petitioner's operations were affected on the roads and especially on local operations, picking up and delivering freight. On the road, circuitous routes had to be followed. Local transportation, in the picking up and delivery of freight, was affected in that, because of fallen trees for 3 or 4 days, it was almost impossible to reach some consignees or shippers' platforms, and, after lanes were cut through the fallen trees, pick-up and delivery of freight required 3 or 4 times the usual time. Schedules could not be maintained, requiring platform crews to be maintained 24 hours a day. This caused extra expense, as did the necessity for repairs to revenue equipment, and fuel and oil therefor. Expense of tires and tubes increased because of extra mileage in road operations. There was extra expense for purchasing transportation and drivers' extra road expense. This condition continued for about 10 days to 2 weeks, as to road operations, and for about 6 weeks as to local operations. Figured on the basis below stated, petitioner incurred in 1938 unusual expenses because of the hurricane to the amount of $19,891.47. Of this, $19,281.90 was for excess cost of checkers, handlers, and local cartage, and $609.57 was for out-of-pocket road expenses. Such figures are ob-

tained by comparison of freight operating costs for a period of 12 weeks from the period from June 19, 1938, to September 10, 1938, with such costs for an 8-week period from September 11, 1938, to November 5, 1938. A cost of transporting 100 pounds of freight was used as a unit for comparison. The petitioner handled more freight than usual during the hurricane period because of temporary increase in emergency freight from utilities and welfare organizations. Such increase in freight required the expenditure of more money, but would tend to decrease the cost per 100 pounds.

OPINION.

The petitioner regards the extra amounts which the hurricane caused it to expend as losses which are to be disallowed as deductions in computation of the base period average income for excess profits purposes. It is argued that losses due to "storms" are covered by section 711 (b) (1) (E);[2] also that such losses from storms come within "other casualty" within the text of the same subsection. The respondent's position is that such increased operating costs are not "losses" covered by the above section; also that the periods compared are not the same in length and that the expense of a period 10 days prior to the hurricane, along with the period in which it occurred, should not enter into cost of freight carriage during the hurricane; likewise, that the hurricane increased the carriage of freight, so that the increased expense was the result of increased income.

We sustain the respondent's view on this point. In our opinion, an increase in expenses is not includible in losses, within the meaning of the section here interpreted. The word losses should be given ordinary connotation, and, clearly, merely because expenses of conducting the usual business (though unusual in amount) are extraordinarily great, they do not fall within the meaning of "loss." In *Levitt & Sons, Inc.* v. *Commissioner*, 142 Fed. (2d) 795, the petitioner spent money to settle a threatened suit in order to avoid damage to credit reputation and business. Such an expense was obviously unusual. The court said: "The payment was certainly not a loss within § 23 (f). *Kornhauser* v. *United States, supra,* 276 U. S. 145, 152, 48 S. Ct. 219, 72 L. Ed. 505; *Hales-Mullaly, Inc.,* v. *Commissioner,* 10 Cir., 131 F. (2d) 509, 512." Both the cases cited involved expenses obviously unusual, being in connection with litigation against the taxpayer. We see no essential difference between the situations there

---

[2] SEC. 711. [(b) (1) is set forth in footnote 1.]

(E) CASUALTY, DEMOLITION, AND SIMILAR LOSSES.—Deductions under section 23 (f) for losses arising from fires, storms, shipwreck, or other casualty, or from theft, or arising from the demolition, abandonment or loss of useful value of property, not compensated for by insurance or otherwise, shall not be allowed.

and here. A mere increase in expenses of the nature ordinarily incurred was caused by an unusual situation, both here and in the cited case. It is a commonplace that an expense ordinary in its nature is none the less so because it may (like a hurricane) happen only once in a great period of time. No case cited, or that we can find, goes so far as does the petitioner in extending the meaning of the term "loss." We think the petitioner's conception is outside both letter and spirit of the statute, and we hold that the financial results to the petitioner are not losses. This renders it unnecessary to consider the further arguments in that connection.

### III.—Insurance Credits During Base Period.

#### FINDINGS OF FACT.

During all years material hereto petitioner employed an insurance broker to obtain insurance policies for petitioner, and credited, to an account in his name on its books, the amounts of premiums as billed to petitioner. The same amounts were concurrently charged to expenses and allowed as deductions from income. The petitioner charged the account with round sum payments made on account, but the petitioner did not either charge or credit the account with items reported by the broker representing portions of premiums on canceled policies or other adjustments. By reason of the inaccurate accounting, the account on the petitioner's books, at the close of 1939 and the close of 1940 showed a credit to the broker of $6,651.05 in excess of the correct amount due to him. The respondent included the $6,651.05 in taxable income of the petitioner for 1940. The amount of $6,651.05 is included in the amount of $7,579.43 described in the notice of deficiency as "Excessive Expense Deductions." The petitioner claimed deductions totaling the $6,651.05 in its tax returns for 1937, 1938, and 1939.

Petitioner in 1938 accrued $928.38 on its books, and was allowed a deduction therefor in its 1938 tax return, for workmen's compensation insurance premiums in excess of the actual liability, which excess amount was added by respondent to petitioner's income for the year 1940. The amount of $928.38 is part of the adjustment of $7,579.43 described in the notice of deficiency as "Excessive Expense Deductions." The two items of $6,651.05 and $928.38 total the $7,579.43 to which reference is made above.

During the four years just prior to 1940 petitioner had no income similar to that represented by the $6,651.05 added by the Commissioner to petitioner's income for 1940 as overaccruals of insurance payable in prior years. The petitioner wrote off the difference in these accounts in 1941. There was no dispute, or litigation, or threat, or talk of litigation at any time about the two items.

OPINION.

The petitioner first argues that the Commissioner erred in adding the two items totaling $7.579.43 to its income for 1940.

In *Greene Motor Co.*, 5 T. C. 314, following *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359, and *Estate of William Steele*, 34 B. T. A. 173, 176, and the cases there relied on, we held that the Commissioner erred in including in the petitioner's income for 1939 amounts remaining on December 31, 1938, in reserves, admittedly improperly set up in earlier years, additions to which had been claimed and allowed for 1938. We see no essential difference in the situation here at hand, nor any reason upon the record before us why the Commissioner should add the improper and excessive credits to insurance to income in 1940. The cases cited by the respondent are distinguishable on the facts. We hold that the Commissioner erred in adding the $7,579.43 to petitioner's income for 1940. This conclusion renders examination of petitioner's alternative views unnecessary.

IV.—Alleged Losses Disallowable in Determining Excess Profits Tax.

FINDINGS OF FACT.

Damages to cargo (not compensated for by insurance or otherwise) from theft, usually committed by petitioner's employees, took place in the course of petitioner's business, as follows: In 1936, $19,874.71; in 1937, $21,304.58; in 1938, $17,027.08; and in 1939, $25,515.08.

Damage (not compensated for by insurance or otherwise) was sustained by cargo, because of fire, turnover, collision, and rain, in the course of the business, as follows: In 1936, $3,172.80; in 1937, $7,796.74; in 1938, $22,312.61; and in 1939, $27,172.44. The petitioner was insured against cargo damage above $200. It was impossible to secure full insurance coverage against cargo damages. Petitioner itself paid for all such damages up to $200.

Because of accidents in which the petitioner's trucks, cars, and trailers were involved during the years 1936 to 1939, inclusive, the petitioner paid out for personal injuries the following sums, not compensated by insurance or otherwise: In 1936, $32,174.65; in 1937, $21,813.65; in 1938, $26,528.65; and in 1939, $30,510.66. Petitioner during the years 1936 to 1939, inclusive, carried insurance for personal injuries in excess of $10,000 for any one person or group of persons in one accident.

Also growing out of such accidents, petitioner paid out, for injuries to the property of others (not cargo), not compensated by insurance or otherwise, the following sums: In 1936, $14,376.83; in 1937, $11,651.17; in 1938, $12,658.29; and in 1939, $15,131.82. As to such property damage, petitioner carried insurance in excess of $5,000 for any accident.

Because of accidents. petitioner's employees sustained injuries. The employees received from the petitioner weekly payments for disability while disabled, also any medical and hospital bills. Such payments were made in accordance with the workmen's compensation acts of the various states; but during the years 1936 to 1939, inclusive, no payments were made as a result of awards by any state industrial board or similar body. Payments in Connecticut, Rhode Island, and Massachusetts need not be made as result of an award. In New York no cases are concluded except by award. In New York, New Jersey, and Pennsylvania the petitioner carried full workmen's compensation insurance; in Connecticut, Rhode Island, and Massachusetts it carried such insurance in excess of $10,000. The petitioner could have secured full insurance coverage in Connecticut, Massachusetts, and Rhode Island. It could have obtained full coverage on injuries to persons and property of others (as distinguishable from cargo). No payments for injuries to employees were in excess of $10,000 in Connecticut, Rhode Island, or Massachusetts during the years 1936 to 1939, inclusive.

In Connecticut, Rhode Island, and Massachusetts petitioner paid out, for injuries to employees not compensated by insurance or otherwise, the following amounts: In 1936, $6,149.79; in 1937, $7,349.18; in 1938, $5,253.30; and in 1939, $10,748.13.

The petitioner used reasonable precaution against accidents to persons or property. All payments for insurance premiums and for payments for injuries to persons or property were charged to operating expenses and deducted from gross income.

### OPINION.

The question here is whether the amounts paid out by the petitioner, for which it was not compensated by insurance or otherwise, because of the injuries to cargo, persons, and property and to employees are, for purposes of computation of excess profits tax, to be disallowed as deductions for losses under section 711 (b) (1) (E) and 23 (f) of the Internal Revenue Code.[3]

The petitioner relies upon that section and no other. It is there provided that adjustment shall be made, in arriving at excess profits net income in the base period years, by not allowing "Deductions under section 23 (f) for losses" arising from fires, storms, or other casualty, etc., not compensated for by insurance or otherwise. In other words, we are to review the deductions taken in the former year and those taken for losses from fire, etc., are to be eliminated. It is to be noted

---

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(f) LOSSES BY CORPORATIONS.—In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

that we are to disallow not *losses*, but "Deductions under section 23 (f) for losses." But the facts before us are that the petitioner did not take, and was not allowed, the deductions here concerned "under section (f)," but took them for *expenses*, and that would be under section 23 (a) (1) (A). Now, in the computation of base period excess profits net income, the petitioner urges the disallowance of the same items as losses under section 23 (f) and the provisions of section 711 (b) (1) (E). Not only do we find illogic in the presentation now as loss of what both petitioner and the Commissioner (by allowance of deduction) regarded in the base period years as expenses, but the statute appears to contain no ground for the view taken by the petitioner. We find no authority to change an expense under section 23 (a) (1) (A) into a loss under section 23 (f), in order to consider and disallow it in connection with the excess profits tax law. The statute on its face puts us in the position of examining returns, not amending them.

Moreover, neither in section 711 (b) (1), nor elsewhere, except in subsection (J) thereof, do we find any provision for disallowance of deduction of expenses. No specific subsection is devoted to expenses as subsection (E) is to losses. The petitioner, however, specifically, and relying on *Colson Corporation*, 5 T. C. 1035, and *Carter Mullaly et al., Trustees*, 5 T. C. 1376, argues, we think correctly, that subsection (J), as well as (H) and (I), is not to be here considered and may not be basis of disallowance, because the petitioner has not made the showing required by subsection (K) (ii). Therefore, if, as petitioner and Commissioner viewed the matter in the income tax returns, it is one of business expenses rather than losses, the adjustment sought may not be made.

In our opinion, the facts here present expenses, not losses. It seems clear that the object of the provisions of excess profits tax law with reference to abnormalities in base period years is to arrive at a fair average net profit, on which to compute a credit so as to arrive at a fair and proper excess profit for taxation. Essentially, therefore, it is necessary to inquire as to what is normal for the taxpayer. We have before us here a motor carrier of freight, operating on a large scale and over several states. The alleged "losses" are to cargo transported, because of theft, fire, turnover, collision and rain, payments to others, because of accidents in which motor cars, trucks, and trailers were involved, for injuries to persons and property of others (not cargo); also payments, without awards, to petitioner's employees under workmen's compensation laws because of injuries sustained. We view all these matters as normally incident to the business of the petitioner and not involving any concept of the abnormality which the intent of the statute requires for disallowance. The amounts

expended on them were to the petitioner all "recurring expenses" and "of the nature of ordinary and necessary expenses," as we said in *W. H. Loomis Talc Corporation*, 3 T. C. 1067, with reference to payments to compensate workmen for injuries.[4] This is indicated not only by the character of the business and operations as shown in the evidence, but by the large amounts involved in the "losses" claimed. A common carrier constantly shipping freight over the public highways may not reasonably be said to suffer unusual casualty or abnormal "loss" as a result of the matters here being considered. The fact that insurance was, to a major extent, purchased against the outlay of the moneys is not without significance as recognition of their common recurrence. The theft involved was usually by employees, and appears for that reason even more as an incident of the business. Fire in cargo, apparently occurring in connection with accidents, at least not shown to happen otherwise, appears to us in a different category from fire involving, for instance, petitioner's buildings, and, therefore, to partake of no nature of abnormality. In any event, the amount paid out because of fire is nowhere separately shown.

Again, we regard the facts before us as showing that most, if not all, of the items here considered arose from claims within the meaning of subsection (H).[5] We so held in *W. H. Loomis Talc Corporation, supra*, with reference to deduction for workmen's compensation payments, one of the classes here involved. If a deduction is "attributable to any claim," it is allocable to that subsection. The petitioner argues that under the doctrine of *ejusdem generis* the word "claim" should be "construed as implying more than a mere request for payment" and as similar to "award" or "judgment." We think, however, that, considering the basic intent of the entire statute, "any claim" should not be so restricted, and that matters involving payments for damage to others, such as here at hand, fall under subsection (H). Though the petitioner argues that only awards were involved in the *W. H. Loomis Talc* case, examination of the facts there discloses that some of the payments were voluntarily made. If any payments here involved were made without any claim of right to damages or compensation by the persons injured, the amount is not shown. It only appears that workmen's compensation payments were not paid after awards. Nor do we agree with the petitioner that the *Colson* and

---

[4] Though reference in that case is made to possibility of securing insurance, deductible as expense, the conclusion is based, largely at least, on the nature of the expenses as recurrent and ordinary, rather than unusual and by way of loss, and the view is taken that subsection (H) of section 711 (b) (1)' applied. Under our view here, it is immaterial that insurance, under $200 for each instance, could not be purchased.

[5] (H) Payment of Judgments, and So Forth.—Deductions attributable to any claim, award, judgment, or decree against the taxpayer, or interest on any of the foregoing, if abnormal for the taxpayer, shall not be allowed, and if normal for the taxpayer, but in excess of 125 per centum of the average amount of such deductions in the four previous taxable years, shall be disallowed in an amount equal to such excess.

*Mullaly* cases prevent recognition of the fact that an item comes under subsection (H). That under subsection (K) (ii) an item may not be disallowed without proper showing by the taxpayer, may not blind us to the fact that it is a "claim," therefore falling under that subsection. If the petitioner, as here, does not seek relief thereunder, he loses that opportunity, but that does not change the nature of the deduction, or require it to be elsewhere, and wrongly categorized, e. g., in subsection (E), as the petitioner urges here. We may still decide, as we have, as to which class includes the deduction involved. In the *Colson* and *Mullaly* cases, the petitioner did not seek adjustment of the deductions involved, as does the petitioner here, and the respondent was not allowed to adjust. The cases are no authority that the proper subsection for disallowance of a deduction, if desired, may not be pointed out and disallowance under an inapplicable section denied. The petitioner merely failed to seek relief under the proper category. The items here involved are not denied disallowance because of petitioner's failure to make a showing under subsection (K) (ii), but because the matter does not fall under subsection (E), under which only does petitioner seek relief. Therefore, on consideration of the statutory provisions, the nature of petitioner's business, and of the items of alleged "loss" we conclude and hold that they may not properly be classified as under section 711 (b) (1) (E) as contended by petitioner and, therefore, since the petitioner has made no claim, or showing on which to base a claim, for disallowance of any abnormal amounts involved, they are not to be disallowed in adjusting excess profits net income in the base period.

Reviewed by the Court.

*Decision will be entered under Rule 50.*