E. B. & A. C. WHITING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11359. Promulgated January 16, 1948.

*Laurence F. Casey, Esq.*, for the petitioner.
*M. L. Sears, Esq.*, for the respondent.

114

## OPINION.

DISNEY, *Judge*: Three questions are presented for answer. For clarity we separate them by headings:

### Compensation of Unsworth.

Petitioner contends that the compensation paid Unsworth was reasonable, considering his unique abilities, the additional services rendered by him during the taxable years, and the normal practice with respect to executive compensation. It says that the increase in salary and bonus from $66,000 in 1941 to $123,000 in the taxable years was in fair proportion to the increased value of his services.

The sales of petitioner in 1942 increased about 43 per cent over 1941 and the increase in net income before officers' salaries and bonuses was 115 per cent. The increase in salary and bonus of Unsworth was about 85 per cent. In 1943, when the salary and bonus were the same, there was a decrease of about .8 per cent in sales as compared with those in 1942, and net income was only about 52 per cent of the net income for the previous year. If the ability of Unsworth as an executive was responsible for the financial success of petitioner in 1942, it was not reflected in the earnings of the succeeding year in comparison with other years. Part of the increase in profits in 1942 was directly attributable to the advantageous purchase of raw material. The purchase of raw material was an ordinary transaction in the life of a corporation like petitioner, and the particular purchase relied on, though indicating close attention to business by Unsworth, was within his ordinary duty and was made by outbidding competitors. It did not require any particular or peculiar ability. We think petitioner overweighs it. Commencing with the fiscal year 1942, Unsworth, as an officer of petitioner, no longer had any executive duties respecting the production of tulatex, which had taken up a considerable part of his time in previous years. Net sales of tulatex in 1941 were about 28 per cent of total sales. The business of petitioner has always involved one of developing substitutes to meet the demands of its buyers. Inability to obtain its usual supply of raw materials increased petitioner's problems to meet trade requirements, but its position in the industry overcame much of the usual marketing problems. The knowledge of Unsworth was not petitioner's only source for preparation of new formulae for brush fiber.

It does not appear that Unsworth's duties as a salesman differed in any material respect in the taxable years from prior years. The fact that petitioner employed no salesman especially to market its product is indicative of the monopolistic nature of its business. Evidence of its unique position in the brush fiber field is contained in the fact that a substantial part of its sales resulted from orders received without

solicitation. In effect, petitioner had not the sale problems usual to ordinary manufacturers.

The services rendered by Unsworth in organizing Fibras Duras are relied upon by petitioner as special duties of important benefit to it. The foreign corporation was formed and owned by Unsworth for the primary purpose of insuring a supply of material for the Tulatex Corporation, which acquired about 90 per cent of its output, the remainder going to petitioner. The services rendered by Unsworth in that regard benefited himself, personally, petitioner, and its subsidiary, in proportions indeterminable from the record. Some time was devoted to that activity by Unsworth during the fiscal year 1942, the exact amount not appearing. His own estimation of the time spent was that he was "on the go constantly" to the Mexican border and in the interior of Mexico. This testimony indicates generally a considerable portion of his time given to Fibras Duras, and is evidence of the ability of subordinates of Unsworth to manage petitioner's affairs, including sales and production, without his presence at the plant. While petitioner was otherwise indirectly benefited through its ownership of all of the stock of the Tulatex Corporation, the latter corporation was the principal beneficiary, and most of Unsworth's services must be regarded as having been rendered as an official of it, for which he received a salary, rather than for petitioner. In any event, the circumstances are against regarding all of the services as having been rendered for petitioner. The services, rendered only in a small part for petitioner, influenced the voting on February 28, 1942, of the bonus of $25,000.

The returns of petitioner for the taxable years reported that Unsworth devoted all of his time to its business, contrary to the evidence here that during such years he also was president and treasurer of the Tulatex Corporation and the Burlington Realty Co., and received salaries from them for his services. The salary from each subsidiary differed in 1943 from the prior year, indicating the existence of some method of measuring the compensation for his services. Unsworth regarded petitioner and its subsidiaries as one entity and admitted that some part of his salary from petitioner was for services rendered to its subsidiaries. The corporations are separate and distinct taxpayers and one may not take a deduction belonging to another. *Hal E. Roach Studios*, 20 B. T. A. 917; *South American Gold & Platinum Co.*, 8 T. C. 1297.

The salary of Unsworth as an officer of the Tulatex Corporation was not large in comparison with his salary and bonus from petitioner, the former having been $12,000 for the fiscal year 1942 and $8,500 for 1943. His services for the Tulatex Corporation during the taxable years were important and took some of his time, occasionally a great deal.

Upon brief, petitioner admits that it is probable that the subsidiary

received some benefit from the services. Unsworth never gave any thought as to whether he was serving the petitioner, Queen City Tulatex Corporation, or Burlington Realty Co., all of which operated from the same office, a practice consistent with his personal opinion that there was only one entity for him to serve.

We find no evidence sufficient to support a conclusion that the bonuses were in recognition of services of Unsworth in prior years. To the contrary is the resolution adopted April 18, 1942, which provides that the bonus of $50,000 was "for his services rendered during the present fiscal year."

The record indicates particular generosity by the petitioner during the taxable years when its net income greatly exceeded those of prior years. Consideration of "financial success" and of the fact that "earned surplus was excellent" affected the directors' action on April 18, 1942, and May 29, 1943, respectively, the dates of resolutions authorizing bonus to Unsworth. This indicates doubt as to whether services actually rendered were being recompensed.

Several witnesses testified for petitioner on the reasonableness of the salaries in question. One, a director of petitioner after August 18, 1942, who voted for the bonus in the fiscal year 1943, did not disclose much knowledge of salaries paid executives of corporations comparable in size to petitioner and was not familiar with the dividend record of petitioner until informed of it while on the witness stand, and he was an interested witness. It does not appear that he took into consideration the duties Unsworth had as an officer of the subsidiary corporations. Another witness testified to the reasonableness of the salary and bonus of $123,000, if "it is based on services rendered to the Whiting Company," but based his opinion to a large extent on the fact that the corporation of which he was chairman of the board of directors, which had sales of about $20,000,000 in 1946, would have paid Unsworth such a salary for full time services. This tends to indicate a lowered figure under the facts here present. The third witness, who was president of a corporation producing brushes from material purchased from petitioner, and household chemicals, testified that he would pay Unsworth 2 or 3 or 4 per cent of sales for his services in a fiber business. At the rate of 2 per cent of sales, Unsworth's salary would have been about $102,000. The salary of the witness was $110,-000 when the corporation of which he was president had net sales of about $14,000,000. The remaining witness, an experienced investment banker who disclosed familiarity with petitioner's business and Unsworth's duties with it for many years, testified that the salary of $123,000 was reasonable. His opinion must be viewed in the light of other of his testimony that in about 1926 (when Unsworth was about 50 years old), he would have recommended a salary of $75,000 for Unsworth to serve as president of a consolidation of corporations,

including petitioner, representing about 70 per cent of the brush business, to produce brush material and brushes.

We think that respondent failed to give full weight to the outstanding qualifications of Unsworth in the brush fiber industry, all of which benefited petitioner, particularly in the taxable years, when lack of raw material required the production of substitute products. On the other hand, there is evidence that some part of the compensation voted for Unsworth was for services rendered to the Tulatex Corporation and on account of increased profits having no direct relation to extra services.

It is apparent that considerable of his time was devoted to Fibras Duras, his own corporation, a fact detracting in no small degree from the value of his services to the petitioner. The record does not show how much, and the witnesses reveal no greater knowledge on the point. That the directorship of a corporation votes compensation is entitled to much weight, but the logic of that rule grows thin when, as here, the beneficiary is largely in command of the corporation, and self-interest may affect sound business judgment, upon which that rule is necessarily based. Unsworth and his family held too much stock in the petitioner for great weight to be given the mere fact of directors' authorization. In our view, he is seen as a valuable man, but, balancing and evaluating all evidence before us, we think it fails to justify the figure asked. From all of the evidence we have found as a fact that $90,000 constitutes reasonable compensation for personal services of Unsworth for each of the taxable years.

### Accrual of $50,000 Bonus in 1943.

The aggregate salary and bonus authorized for Unsworth for the fiscal year 1943 was $123,000, of which only $73,000 was claimed as a deduction in petitioner's return for that year. The respondent allowed $51,000 of the amount as a deduction and disallowed the remainder as representing compensation in excess of a reasonable amount. The question here is whether the bonus of $50,000, or more particularly $17,000 thereof, the difference between the salary of $90,000 held by us to be reasonable and the amount paid by petitioner, is accruable in that year. The issue was raised to insure the allowance of the amount in 1943 or the next year, when paid.

The resolution authorized a bonus "up to but not to exceed $50,000," provided "that said bonus should be paid at such time as in the discretion of the treasurer finances of the corporations will permit."

Petitioner argues that as the services were rendered and unconditional and fixed liability was incurred in the taxable year, the amount was accruable at that time.

The resolution did not fix the amount of the bonus, other than that it was not to be in excess of $50,000. There is no indication in

the record that Unsworth determined upon the amount of his bonus prior to actual payment of the last amount in December 1943, and it does not appear that petitioner ever accrued any of the bonus on its books.

Payment of the bonus was contingent upon the condition of petitioner's finances, the determination of which, like the amount, was left to the treasurer, who was Unsworth. Upon brief petitioner makes no contention that its finances in the fiscal year 1943 were such as to permit payment of the amount and the record is silent on whether Unsworth considered or reached a conclusion on the matter within the taxable year. The fact that nothing was paid on the obligation until September 1943 is some evidence that petitioner's finances prevented payment in the taxable year.

At the meeting during which the bonus was authorized, the directors approved the payment of an additional bonus to employees during the fiscal year 1943. The fact that such a direction was given in the case of employees and not with respect to the bonus authorized for Unsworth indicates their lack of definite action on the time of accrual or payment of the bonus for Unsworth.

In *Ames Reliable Products Co.*, 44 B. T. A. 176, $10,000 of a bonus of $12,000 was made payable by a resolution "when all outstanding bonds have been retired and the cash position of the Company warrants." We held that the resolution did not create a fixed or certain obligation to pay and that the contingency prevented accrual of the amount in the taxable year as a liability. A similar contingency was present in *Harrington Co.*, 6 T. C. 720, in which we held that the expense was not incurred in the taxable year involved therein.

In *Anderson-Clayton Securities Corporation*, 35 B. T. A. 795, cited by the petitioner, the liability for payment of net profits was determined in the taxable year and the amount thereof was not ascertained until the next year. Here only the maximum amount was fixed and liability was conditioned upon future events, which might never occur. On this issue we sustain the respondent.

*Loss Disallowance—Sec. 711 (b) (1) (J) (ii).*

In his answer to the amended petition filed herein at the hearing the respondent affirmatively alleged that the petitioner failed to comply with the provisions of section 35.711 (b)-2 (a) and (b) of Regulations 112, relating, in general, to classification of deductions under section 711 (b) (1) (H), (I) and (J) of the Internal Revenue Code, accompanied by a statement in support of a claim for disallowance of deductions under one or more of such subparagraphs. He contends upon brief not only that there was no compliance with the regulations, but that no refund claim was ever filed, claiming the benefits of section 711, and, accordingly, none was ever disallowed.

While the respondent did not question our jurisdiction in any of his pleadings, the nature of his argument suggests that the filing and rejection of a claim for refund must have occurred to give this Court jurisdiction. We can not agree. A deficiency was determined and question arises under section 711 (b) (1) (J). Neither section 732 nor any other requires denial of a claim for refund as a prerequisite to our jurisdiction. The requirements as to section 722 do not apply as to section 711 (b) (1) (J). They were present in the law from 1940 and prior to the later amendments as to payment and refund claim under section 722. Section 729, from and after 1940, applied to the subchapter on excess profits taxes all provisions of law applicable to taxes imposed by chapter 1 of the code, and, therefore, applied the provision as to appeal from a determination of a deficiency involving section 711 (b) (1) (J). We conclude that we have jurisdiction.

In the light of the conclusions hereinafter reached by us, we pass as unnecessary of consideration the point as to whether petitioner complied with the regulations issued under section 711 (b) (1) (J).

The petition and amended petition alleged as error the failure of respondent to increase petitioner's excess profits credit each year by restoring to its base period years the amounts of its "abnormal" losses incurred in the development of tulatex, citing section 711 (b) (1) (J)[1] and refusing refunds to it based upon adjustments under that subparagraph. The allegation of facts in the amended petition states that such losses for the fiscal years 1936 to 1940, inclusive, reasonably constituted a separate class of deductions under section 711 (b) (1) (H) of the code; that the loss sustained in the development and sale of tulatex in the fiscal year 1940 was abnormal, citing section 711 (b) (1) (J) (i) and that the amount of $65,526.30 should be disallowed in computing its excess profits net income for that year. Allegations of fact are then made in the alternative, citing section 711 (b) (1) (J) (ii). The petition and amended petition make no reference to section

[1] SECTION 711. EXCESS PROFITS NET INCOME.

* * * * * * *

(b) TAXABLE YEARS IN BASE PERIOD.—

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made (for additional adjustments in case of certain reorganizations, see section 742 (e)) :

* * * * * * *

(J) Abnormal Deductions.—Under regulations prescribed by the Commissioner, with the approval of the Secretary for the determination, for the purposes of this subparagraph, of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

(ii) If the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

711 (b) (1) (K), paragraph (ii) of which is set forth in the margin,[2] but allege that the operating loss deduction for 1940 was not a consequence of increase in gross income nor of decrease in some other deductions, in the base period—elements required by subparagraph (K) (ii).

The applicability of section 711 (b) (1) (H)[3] is not discussed by the petitioner upon brief, in view of which it will be assumed that it no longer relies upon that provision of the statute. On the face of that subdivision, it is clear that it does not in terms apply; nor can it be applied by any interpretation we consider possible. Petitioner pleads that the operating loss in the tulatex department for the fiscal year 1940 should be disallowed under "section 711 (b) (1) (J)" in computing its excess profits credit. The respondent's rejection of petitioner's claim for refund was a general denial of petitioner's establishment of any right to adjustments under section 711 (b) (1) (J). Petitioner's burden here was to prove facts bringing the loss for 1940 within subparagraph (J).

Petitioner now on brief concedes that the tulatex expenses for 1940 were not abnormal as to class, but says that they were abnormal as to amount. It further concedes that the operating loss in that year of $65,526.30 should be reduced to $45,120.26 by excluding therefrom all allocated costs which were included in arriving at the former figure. It then argues that the actual costs, amounting to $45,120.26, should be restored to the net income for 1940 to the extent that they exceed 125 per centum of the average of like costs, adjusted by eliminating allocated items of expense, for the four preceding taxable years. By such a method it arrives at the figure of $32,330.34 for adjustment of excess profits net income for 1940.

Thus, it is seen that the petitioner no longer relies upon subparagraph (J) (i) and is now seeking relief only under subparagraph (J) (ii), and under it only for an adjustment in 1940, upon the ground

---

[2] SECTION 711. EXCESS PROFITS NET INCOME.

\* \* \* \* \* \* \*

(K) Rules for Application of Subparagraphs (H), (I), and (J)—For the purposes of subparagraphs (H), (I), and (J)—

\* \* \* \* \* \* \*

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

[3] SECTION 711. EXCESS PROFITS NET INCOME.

\* \* \* \* \* \* \*

(b) TAXABLE YEARS IN BASE PERIOD.—

\* \* \* \* \* \* \*

(H) Payment of Judgments, and So Forth.—Deductions attributable to any claim, award, judgment, or decree against the taxpayer, or interest on any of the foregoing, if abnormal for the taxpayer, shall not be allowed, and if normal for the taxpayer, but in excess of 125 per centum of the average amount of such deductions in the four previous taxable years, shall be disallowed in an amount equal to such excess.

that such restoration gives it greater relief under the statutory growth formula in section 713 (f).

To be entitled to an application of subparagraph (J) (ii), petitioner must establish that the loss sought to be applied as an adjustment represents a classification of deductions within the meaning of the statute. The petitioner contends that the expenses which created the loss are a proper classification of deductions and cites section 35.711 (b)–2 (a) of Regulations 112, reading, to the extent material, as follows:

Deductions which do not fall within either of the classes specified in section 711 (b) (1) (H) and (I) may be grouped by the taxpayer, subject to approval by the Commissioner on the examination of the taxpayer's return, in such other classes as are reasonable in a business of the type which the taxpayer conducts, and are appropriate in the light of the taxpayer's business experience and accounting practice. Such a classification will be applicable to all other taxable years considered at any time in adjusting deductions under this section, and must be consistent with any classification made by the taxpayer under the provisions of section 721 and section 722.

Respondent contends that the term deduction "Represents those amounts which go to reduce gross income and to produce net taxable income"; that it does not permit a reclassification of deductions to produce a loss not properly deductible under section 23 (f); that the tulatex account in which the loss occurred was maintained for internal control; and that the statute does not recognize classification of departments of a business. He admits that the expenses included to make up the losses are "deductions."

The loss each applicable year, without allocated amounts, was computed by deducting various expenses from sales, with adjustments for cost of crude material and opening and closing inventories.

"The statute * * * is remedial and should be given a reasonable and rational construction." *Iron Fireman Manufacturing Co.*, 5 T. C. 452 (463) It does not require that the classification of deductions necessarily follow deductions taken by the taxpayer under section 23. *Green Bay Lumber Co.*, 3 T. C. 824, in which we held from the peculiar facts involved therein that bad debts of employees constitute a class of deductions different from other bad debts of the taxpayer. Cf. *Arrow-Hart & Hegeman Electric Co.*, 7 T. C. 1350 (1369 and 1379); *Oaklawn Jockey Club*, 8 T. C. 1128. Petitioner here seeks relief based upon more than a subdivision of a class of deductions normally incurred by it. It is asking that we recognize as a loss, expenses involved in the operation of one of the departments of its business, decreased by sales of the product produced in the department and adjustments for inventory. Petitioner points to no statutory provision permitting as a deduction from gross income the net financial result of the operations of its tulatex department and its predecessor, the hairtex department, and we find none. The amount of such a loss would be affected each year by sales, which are

not deductions, and opening and closing inventories, thereby preventing any reasonable comparison of deductible expenses, not at cost to the petitioner, but at the price for which it could be sold. If this does not show that there may, to that extent, have been decrease in petitioner's deduction (within the language of subparagraph (K) (ii))—for cost of material, it at least demonstrates the lack of the nature of a true deduction to the petitioner, in the "loss" for which petitioner contends; for it is obvious that the waste material might, per pound or other unit, be sold for more than its original purchase price—particularly if, such as in the purchase of the ship's cargo at Everglades, Florida, in 1942 (of course not involved in 1940 and mentioned here only by way of example). It appears altogether possible, for instance, that the poundage of waste in istle might, after going through partial processing, be worth more for sale to some other manufacturer than the original cost of istle per pound. In such case, clearly the sales price figure, higher than original cost per pound, when charged to the tulatex department, would tend to increase its "loss" contrary to the fact that petitioner actually paid less for the material. Though the amount of waste may not have been great, *pro tanto*, there would in such case be no true loss to the petitioner.

The grouping here is of departments, and not deductions. The flexibility of the method is illustrated by the concession of petitioner that the operating loss of $65,526.30, as originally claimed, should be reduced by the items therein, totaling $20,406.04, representing allocations of general expenses, including selling, administrative, insurance, and depreciation. Thus the amount now being claimed as a class of deductions is exclusive of certain indirect costs and no longer represents the original account. In its present form the account does not represent the "loss" of the tulatex department.

Petitioner's auditor, who supervised the keeping of its books, testified that items in the account for 1940 other than amounts reached by allocation methods were actual and direct costs. The transcript of the account discloses otherwise. Under the heading of "Indirect costs" appears an amount for indirect labor and indirect supplies. An item of $15,290.31 for direct labor is listed at the bottom of the summary. The division of labor charges is inconsistent with the testimony of the witness. The account also includes an amount for repairs to buildings. Nothing of record is contrary to the idea that at least some part of the amount charged in the account for repairs to buildings resulted from ordinary wear and tear to the property, repairs that would have been necessary without use of the building to produce tulatex. The amount in the account for repairs to machinery and equipment, when compared with prior years, indicates that it contains charges for property chargeable to other accounts. Considerable expense was

incurred in the fiscal year 1940 in altering machinery to produce tulatex satisfactorily. No proof was made that such capital costs were not charged to repairs. Substantially the same amount of crude material was received in the department in 1936 and 1940, yet only $4,587.48 was charged for repairs in the former year against $13,103.99 in the latter year. In 1939, when crude material received amounted to $11,242.72, or about 37 per cent of 1940, the repair charges were only $618.79.

A similar situation prevailed in *Consolidated Motor Lines, Inc.*, 6 T. C. 1066. There the petitioner sought to treat increased ordinary expenses caused by a hurricane as a loss deduction within section 711 (b) (1) (E). We held that the expenses were not losses.

The regulations require that any grouping of deductions in a class under subparagraph (J) be consistent with any classification made by the taxpayer under the provisions of sections 721 and 722. Sec. 35.711 (b)-2 (a), Regulations 112.

In its application, filed on Form 991, for relief under section 722 for the fiscal year 1941, based upon a change in the character of its business by the manufacture of tulatex, in 1941 petitioner charged to tulatex a portion of all of its expenses, except interest paid, and determined, by deducting such expenses from gross profit on sales, that of its normal tax net income, 30.515 per cent thereof was attributable to tulatex and the remainder of 69.485 per cent to production of brush fibers. Those ratios were used for determining like income for the base period years 1937 to 1940, inclusive. The grouping of "deductions" there involved a comparison of sales of each class of products in the taxable year 1941, and an application of the result to base period years. The grouping here is of a different kind, being a comparison of expenses of producing and selling tulatex alone. Under the method used in the application under section 722, normal tax net income for 1940 in the amount of $241,000.80 was increased by $105,837.80 to determine what such income would have been if tulatex had been manufactured in that year. Normal tax net income in each of the prior base period years was increased in the same proportion by the same method. Here a "loss," and not increased net income, is being claimed each base period year in the production of hairtex or tulatex.

The application under section 722 contained deductions for selling expenses which are eliminated here under petitioner's concession. There in 1941 tulatex absorbed $70,176.67 of the total administrative expense of $118,446.26. Here, the charges under the heading "administrative expense" are not taken into account, but some of the accounts, classified there as administrative expenses, are included in the years involved herein as charges under "Indirect costs" and "Manufacturing overhead." The accounts here contain charges for "Indirect Sup-

plies," the amount for 1940 being $22,035.50. We find no such account, or one for "Machine Shop Labor" in the claim under section 722. Under the circumstances, it appears that the grouping here is not consistent with the classification made by the petitioner in its application for relief in 1941 under section 722.

Considering all of the facts, we conclude that the tulatex department account and its predecessor, with or without the concession of petitioner as to allocated charges, do not constitute a class of deductions within the meaning of subparagraph (J) (ii).

Moreover, even if the "loss" involved was a deduction within section 711 (b) (1) (J) (ii), in our opinion the petitioner has the burden of establishing, under section 711 (b) (1) (K) (ii), that the excess amount involved in such deduction is not a consequence, *inter alia*, of a change in type, manner of operation, size, or condition of its business; and that it has failed so to establish. The petitioner took the view at trial that because of the nature of the Commissioner's reference to section 711 (b) (1) (J) in the deficiency notice, in referring to decreased costs, it had not the burden of showing lack of consequence of change in type, manner of operation, size, or condition of business. Its amended petition pleads that the loss was not a consequence of increase in gross income or decrease in other deductions. But for the same reason which above caused us to hold that a claim under section 711 (b) (1) (J) was filed and rejected, we hold that the petitioner has as to all of the elements therein specified by subparagraph (K) (ii) the burden therein cast upon it. *William Leveen Corporation*, 3 T. C. 593; *R. C. Harvey Co.*, 5 T. C. 431; *Wentworth Manufacturing Co.*, 6 T. C. 1201; *Harris Hardwood Co.*, 8 T. C. 874. The claim was not presented in the return, but in a protest, and was discussed in conference. The respondent urges that there was no claim presented, but we have above concluded that there was; but we also think that, in the absence of more definiteness in claim, the petitioner can not be heard to say that the rejection in the deficiency notice should be held to the narrow limits proposed. The petitioner on brief, arguing against the respondent's contention that regulations had not been complied with, alleged that in the notice of deficiency the Commissioner had used the language of subparagraph (K) (ii) in holding that petitioner had not established its right to restore the tulatex losses to base period net income, and added: "These statements can only be interpreted as a finding that petitioner had not met the requirements of paragraph (K) (ii) of the section"—going on to contend that the rejection was for certain definitely stated reasons. Assuming that the deficiency notice is a rejection under subparagraph (K) (ii), as petitioner says, we do not agree that the reasons were definitely limited, but agree that subparagraph (K) (ii) was covered, and

consider it covered in general, and that the reference to decrease in costs does not limit the rejection. The rejection refers to "your contentions," not certain contentions, and then states that petitioner's right to have operating losses added back to income have not been "established." If the Commissioner was correct, his reasons need not be detailed. The expression is obviously general, and not limited to one element of subparagraph (K) (ii). The statute provides that deductions shall not be disallowed (under subparagraph (J)) unless the petitioner establishes that the excess is not a consequence of the elements here considered. We see no reason here to relieve the petitioner of that burden. Moreover, the respondent pleaded in the alternative that there was change in type, etc., within subparagraph (K) (ii), and the petitioner replied denying that the abnormality was a consequence of such change, and it argues that the question is squarely presented by the pleadings, and that it has established that none of the factors specified in subparagraph (K) (ii) prevents disallowance of the claim. It thus appears that it may be that the petitioner does not now deny its burden in this respect. Regardless of burden, we think the facts of record show that requirements of subparagraph (K) (ii) are absent. *Pepsi Cola Co.*, 5 T. C. 190.

At a time prior to the present controversy, the petitioner asked for relief under section 722 of the Internal Revenue Code for the fiscal year 1941. The basic reason advanced therefor was that "the character of the business" on "January 1, 1940" (apparently meaning June 1, 1940), was "Mfg. of brush fibres and tulatex pads," whereas the "character of the business" in each of the base period years had been "different," that is, had been "Manufacture of brush fibres." Though recognizing that it has been said that "change in character" of business under section 722 is not synonymous nor interchangeable with "change * * * in the condition of the business" under section 711 (b) (1) (K) (ii) (*Arrow-Hart & Hegeman Electric Co.*, 7 T. C. 1350, 1379), nevertheless, we note that under the text of section 722 (b) (4), " 'change in the character of the business' includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, * * *." It is clear that at that time the petitioner took the view that there was a change "in the operation or management of the business," and we would be wholly unrealistic were we not to hold on the facts that here this is the same as change in the manner of operation and condition of the business, within the intendment of section 711 (b) (1) (K) (ii). Particularly, we can not doubt that there is no essential difference between change in operation and change in manner of operation; nor that at an earlier time the petitioner properly so considered, when proceeding under a statute which,

like the one here considered, involved the ascertainment of normal income. We think the language then used may be more safely relied on, as petitioner's appraisal of the facts involved, than the petitioner's present arguments (though the petitioner was not estopped to change view); moreover, that plainly there had been a change in manner of operation of the petitioner's business, involving manufacture of a new and greatly sought product not theretofore manufactured. The "loss" or deduction here involved was incurred in making the change. Indeed, the petitioner requests a finding of fact that the loss "was sustained because various experiments were still being made, because petitioner kept changing the kind of prepared material it was attempting to make, and because the necessary changes in machinery were very costly." All this is encompassed in change in manner of operation and condition of business. The argument that the experimental stage was not "change" within the statute neglects the fact that sales of the product were being made in the fiscal year 1940 (in September 1939), and that there was, because of acquisition of machinery for tulatex products, expansion of plant capacity from 1935; and that the 1940 loss is therefore seen to be from both experimentation and selling the product.

The petitioner states on brief that it is clear that by the end of the base period a new product had been developed, and maintains that "such new product was the consequence of, and was made possible by, the experiments and expenses of the Tulatex department, principally those of the fiscal year 1940." The record shows the experiments continuing in 1940, and on brief the petitioner says they reached a climax near the close of that fiscal year. Elsewhere, the petitioner urges that the loss in 1940 "was due to two factors, (1) the experiments and the resulting labor, materials and repair costs and (2) its inability to make greater sales of Tulatex or to secure a better price * * *." Again: "It was the constant changes in materials and in adaptation of the machinery that restricted petitioner's volume of production and sales of Tulatex, and produced the loss."

Thus it appears that the petitioner affirmatively charges the loss in part to the experimentation. Its earlier view was that the loss was abnormal in class. (That greater sales were not made at a profit to offset the loss, does not, in our view, detract from the fact that the loss was primarily a consequence of the experimentation in developing the new product.) This case, therefore, in our view, falls within the decision in *Surface Combustion Corporation,* 9 T. C. 631, where expenses of experiments as to "Kathabar" to perfect air conditioning apparatus were denied disallowance under section 711 (b) (1) (J) (i) for the reason that the requirements of subparagraph (K) (ii) had not been met, we finding that there the expenditures were a consequence of change in type of business. There, as here, only one depart-

ment of the petitioner's business was involved and a new product was developed for sale. In coming to our conclusion we said: "The need for all of those research and development expenses was occasioned by petitioner's entrance into a new field of business." There is no essential difference here.

The petitioner was entering and was in 1940 in a new field of business, that of manufacturing and selling an important product not theretofore produced by it. It had earlier sold certain waste as such. Now it manufactured it, to some extent, into a finished product, after many experiments and with different machinery than before used. Indeed, the petitioner itself minimizes the connection of the tulatex pads manufactured with the waste formerly sold, for, on brief, it is argued that the experimental development of tulatex was started in January 1938, that in 1939 the waste utilization was largely abandoned and "The percentage of waste employed in the operation in 1940 was insignificant in relation to the size of the experimental program," and that there was "a concerted drive for development and sale of a new product." Thus, there was largely a new product. That is just the case in *Surface Combustion Corporation*. As in the *Surface Combustion* case, there was acquisition of a license to produce air-conditioning equipment, and thereafter experimentation, so here there was acquisition of the "Hairtex" trade name and trade-mark and some machinery followed by experimentation leading to sales of tulatex. In *Wentworth Manufacturing Co.*, *supra*, we found abnormalities to be a direct consequence of change in manner of operation of business, where there was mere employment of inspectors and measures to overcome a manufacturing deficit in that garments were being produced which did not conform to standard sizes. We think that the business here, with the change to tulatex, became as "different" as the petitioner thought when pressing its claim under section 722. Unsworth testified that the development of tulatex constituted a change in the size of the business, and that there was a new branch of business; a new development; that new machinery was purchased. The new portion was in the next year incorporated separately. We hold that the loss and "deduction" urged for 1940 was a consequence of a change in the type and manner of operation and size and condition of the petitioner's business, within the language of subparagraph (K) (ii); therefore, that the amount may not be disallowed in computing excess profits income for 1940.

In view of the conclusion reached by us, it is unnecessary to consider argument of the parties on other points involved under the issue. On this issue we hold for the respondent.

*Decision will be entered under Rule 50.*