Jesse L. Terry and Kathleen N. Terry v. Commissioner.
Terry v. Commissioner
Docket No. 19946.
United States Tax Court
1949 Tax Ct. Memo LEXIS 72; 8 T.C.M. (CCH) 868; T.C.M. (RIA) 49232; September 22, 1949
William H. Hall, Esq., for the petitioners. Stanley W. Herzfeld, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioners challenge respondent's determination of a deficiency in income and victory tax of $23,405.02 for the year 1943. The year 1942 is involved because of the Current Tax Payment Act. The only question is whether $60,000 received in 1942 as compensation for personal services is subject to apportionment under section 107, Internal Revenue Code. Findings of Fact Petitioners Jesse L. and Kathleen N. Terry, husband and wife, filed joint Federal income and victory tax returns on the cash basis for the years 1942 and 1943 with the collector of internal revenue for the district of New Jersey. Petitioner Jesse *73 L. Terry, hereinafter called petitioner, is a public utilities consultant with offices at Princeton, New Jersey, and West Palm Beach, Florida. His activities consist of making appraisals and surveys for public utilities and functioning as broker and negotiator in the purchase or sale of utility properties. In 1935, after Congress enacted the Public Utility Holding Company Act requiring public utility holding companies to dispose of certain properties, petitioner approached several companies with a view to representing them in the sales. In that connection and beginning in March, 1936, he talked with Gilman Smith, who was a director of Continental Gas & Electric Company and president of Northern Shares, Inc., an investment trust which owned a large interest in Continental's parent, United Light and Power Company. Petitioner offered to act as broker in disposing of properties of Panhandle Power & Light Company, Cimarron Utilities Company, Guymon Gas Company, and Kansas Power & Transmission Company, all subsidiaries of Continental. After a discussion between Smith and Charles McCain, president of Continental, petitioner was orally authorized to attempt to find purchasers for the above *74 properties. Petitioner made an investigation to discover prospective purchasers, and concluded that Community Light & Power Company was the logical purchaser. After conferring with Community's president and vice-president and finding them interested in acquiring some of the properties, petitioner arranged a meeting in the fall of 1936 between those officers and Smith. At that time the principal difference between the parties was that Community wanted to purchase only the Panhandle properties and wanted to include two of its own properties in the trade, while Continental desired a cash sale of its properties. After a second meeting arranged by petitioner in 1938 between officers representing Continental, Community, and Panhandle, Community's president submitted a formula whereby the differential in value of the properties in the proposed exchange would be paid by Community. Following a third meeting, negotiations were temporarily discontinued in March, 1939, pending consideration by Continental of legal problems connected with the proposed transactions. In April, 1939, W. G. Woolfolk became president of United and Continental. He desired that the terms of petitioer's contract be *75 in writing. In a written contract executed on February 8, 1940, between petitioner and Continental executed by Gilman Smith as vice-president, Continental agreed to pay petitioner $60,000 if all the properties were sold by June 30, 1941, as a result of negotiations originated by him. In addition, petitioner was thereafter to be reimbursed for his out-of-pocket expenses. Continental's original asking price for the properties of Panhandle, Cimarron, and Guymon was $8,000,000. Community's first offer for those properties was $6,000,000. In May, 1940, the parties agreed upon a price of $7,250,000 and executed a written contract of sale in August, 1941. In July, 1942, after a hearing, the Securities and Exchange Commission approved that contract and the amount of petitioner's compensation. The properties of Kansas Power were sold in October, 1941, for $113,000 to Western Light & Telephone Company as a result of negotiations begun by petitioner. In September, 1942, petitioner received $60,000 from Continental as compensation for his personal services as broker. These services were rendered throughout the period from 1936 to 1942. In their return for the year 1942 petitioners computed *76 their tax on the $60,000 by apportioning it over the years 1936 to 1942, inclusive, under section 107, Internal Revenue Code. In his notice of deficiency respondent: "* * * determined that the amount of $60,000.00 received by you during the taxable year 1942 for services rendered as broker or agent is not subject to the provisions of Section 107 of the Internal Revenue Code." Opinion Our findings dispose of what respondent concedes is the only issue, and require disposition in petitioner's favor on authority of James D. Gordon, 10 T.C. 104, acq., I.R.B., August 22, 1949, p. 1, which respondent makes no effort to distinguish. The services for which petitioner ultimately received the compensation of which he claims proration under section 107 clearly began when he brought together the seller and prospective purchaser of the properties. This occurred in 1936. The services continued at least until the hearing before the Securities & Exchange Commission in 1942, at which petitioner's testimony was used to assist in obtaining that body's essential consent to the sale. The sole question - the length of the period of services *77 for which petitioner was compensated - is thus necessarily to be answered in his favor. Decision will be entered for the petitioner.