IRON FIREMAN MANUFACTURING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 1908. Promulgated July 19, 1945.

*Fletcher Rockwood, Esq., Charles E. McCullough, Esq.,* and *Thomas D. Stoel, Esq.,* for the petitioner.

*Earl C. Crouter, Esq.,* for the respondent.

456

OPINION.

MELLOTT, *Judge*: The first question is whether respondent properly disallowed a deduction of $11,823.12 representing the net long term capital loss claimed by petitioner for the year 1940 on its investment in the capital stock of the St. Louis Co., a wholly owned subsidiary.

Petitioner concedes that on the basis of the stipulated facts, the substance of which is shown in our findings, the stock of St. Louis Co. had no actual liquidating value at the beginning of the year 1940. At that time the total assets were approximately $306,000 and the liabilities $348,000—a difference of $42,000, shown as a deficit in surplus. It argues, however, that the stock had a potential value, pointing out that the next year the same business, operated in a similar manner and with the same personnel, produced a net income in excess of $26,000, or more than two-thirds of the amount of the existing deficit, and that the owner of the stock had a reasonable hope and expectation that continued operation of the business would result in reestablishing a substantial equity in the stock. We agree with petitioner and have found as a fact that the stock was not worthless at the beginning of the year 1940.

No attempt to rationalize completely the conclusion which has been reached need be made. The view we have taken accords with that frequently expressed by this and other courts. For example, in *Sterling Morton*, 38 B. T. A. 1270; affd., 112 Fed. (2d) 320, where the taxpayer was claiming a loss in one year and the Commissioner was contending that it had occurred in an earlier year, it was said:

The ultimate value of stock, and conversely its worthlessness, will depend not only on current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets

of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value, and can not be said to be worthless. * * *

Numerous cases have been decided applying, by implication, the view thus expressed, among others *H. Liebes & Co.*, 23 B. T. A. 787; *Walter H. Goodrich & Co.*, 40 B. T. A. 960; *Olds & Whipple, Inc.* v. *Commissioner*, 75 Fed. (2d) 272; *B. F. Sturtevant Co.*, 47 B. T. A. 464; *Rassieur* v. *Commissioner*, 129 Fed. (2d) 820; *Miami Beach Bay Shore Co.* v. *Commissioner*, 136 Fed. (2d) 408; and *Smith* v. *Helvering*, 141 Fed. (2d) 529. On the authority of the cited cases it is held that the stock of St. Louis Co. was not worthless at the beginning of 1940.

But respondent does not peg his disallowance of the claimed deduction solely to his argument that the stock became worthless prior to the taxable year. He contends that, regardless of whether the stock had any value at the beginning of the year, the claimed deduction must be denied under section 112 (b) (6) of the Internal Revenue Code[1] because cash in the sum of $8,176.88 must be regarded as "property" distributed on liquidation and no gain or loss can be recognized. His argument is ingenious, but in our judgment erroneous under the facts before us. Here there was no liquidating dividend. The St. Louis Co. owed petitioner $308,219.76. The proceeds from the sale of its assets amounted to only $265,950.84, an amount insufficient to pay its indebtedness. There were, therefore, no assets left for distribution to its stockholders on liquidation.

The sum of $8,176.88 which respondent contends was property distributed on liquidation was not an asset of the St. Louis Co. It was a part of the sum of $50,445.80 representing net operating losses of the St. Louis Co. deducted by petitioner in consolidated returns for prior years, $42,268.92 of which was offset against petitioner's loss from advancements to St. Louis Co. in like amount, leaving a balance of $8,176.88 which petitioner offset against its capital stock investment of

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

* * * * * * *

(b) EXCHANGES SOLELY IN KIND.—

* * * * * * *

(6) PROPERTY RECEIVED BY CORPORATION ON COMPLETE LIQUIDATION OF ANOTHER.—No gain or loss shall be recognized upon the receipt by a corporation of property distributed in complete liquidation of another corporation. For the purposes of this paragraph a distribution shall be considered to be in complete liquidation only if—

(A) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 per centum of the total number of shares of all other classes of stock * * *.

$20,000 in computing the claimed long term capital loss in the amount of $11,823.12. This method of computation was proper. *Edward Katzinger Co.*, 44 B. T. A. 533; affd., 129 Fed. (2d) 74.

All of the assets of the St. Louis Co. were distributed to petitioner in part payment of its indebtedness to petitioner and, since nothing remained for distribution to the stockholders, there was no distribution in complete liquidation within the purview of section 112 (b) (6). *H. G. Hill Stores, Inc.*, 44 B. T. A. 1182; *Glenmore Distilleries, Inc.*, 47 B. T. A. 213. We hold, therefore, that petitioner is entitled to the claimed deduction for loss from the stock of the St. Louis Co. *B. F. Sturtevant Co., supra.*

The last question is whether petitioner is entitled to restore to its base period income for the years 1937 and 1938, for excess profits tax purposes, replacement expenses in those years alleged to be "abnormal" within the meaning of section 711 of the Internal Revenue Code as amended, retroactively, by sections 3 and 17 of the Excess Profits Tax amendments of 1941.[2]

There is no contention that the deductions were of a class abnormal for the taxpayer or that there is any error in the computation shown in our findings. The disallowance of the claimed adjustments is predicated upon respondent's determination that petitioner has failed to make the proof required under subsection (K) (ii), *supra*. Since

---

[2] SEC. 711. EXCESS PROFITS NET INCOME.

* * * * * * *

(b) TAXABLE YEARS IN BASE PERIOD.—* * *

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made * * *.

* * * * * * *

(J) ABNORMAL DEDUCTIONS.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination, for the purposes of this subparagraph, of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

(ii) If the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

(K) RULES FOR APPLICATION OF SUBPARAGRAPHS (H), (I), AND (J).—For the purposes of subparagraphs (H), (I), and (J)—

(i) * * *

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

(iii) The amount of deductions of any class to be disallowed under such subparagraphs with respect to any taxable year shall not exceed the amount by which the deductions of such class for such taxable year exceed the deductions of such class for the taxable year for which the tax under this subchapter is being computed.

he does not contend that the excess is not a consequence of a decrease in the amount of some other deduction in its base period, the question which evolves is whether petitioner has established—in the language of the statute—"that the excess is not a consequence of an increase in the gross income of the taxpayer in its base period  *  *  *  and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer." The establishing or proving by competent evidence of these "negative facts" is a difficult task; but, since it is required by the statute "in clear and express terms, its rigors may not be abated by softening construction." *William Leveen Corporation*, 3 T. C. 593. The statute, however, is remedial and should be given a reasonable and rational construction. *Bonwit Teller & Co.* v. *United States*, 283 U. S. 258; *United States* v. *Dickerson*, 310 U. S. 554; *Green Bay Lumber Co.*, 3 T. C. 824.

The four prior years which are applicable to the base period year 1937 are 1933 to 1936, inclusive, while those applicable to the base period year 1938 are 1934 to 1937. During these five years—including for comparison 1938 also—the gross income and replacement expenses were as follows:

| Year | Gross income | Replacement expense | Year | Gross income | Replacement expense |
|------|------|------|------|------|------|
| 1933 | $1, 195, 009. 69 | $7, 659 | 1936 | $2, 612, 513. 08 | $14, 309 |
| 1934 | 1, 465, 750. 14 | 7, 704 | 1937 | 2, 747, 812. 84 | 48, 013 |
| 1935 | 1, 894, 769. 48 | 16, 089 | 1938 | 2, 262, 773. 09 | 44, 413 |

The excess, computed as provided in the statute, which may be disallowed if the conditions prescribed are met, is $25,350.06 for 1937 and $17,502.33 for 1938. (Hereinafter approximate figures will be used in the discussion.) The first query therefore is: Has the excess of $25,000 for 1937 or the excess of $17,000 for 1938 been shown to have been "not a consequence of an increase in the gross income of the taxpayer in its base period?" If this question is answered entirely in the negative—if the required proof has not been made as to either year—then it is manifest petitioner can not prevail even though it be assumed proof has been made that the abnormality or excess was not a consequence of a change in the type, manner of operation, size, or condition of its business.

There was an increase in gross income in the first base period year (1937) over the gross income of the preceding year of approximately $135,000, the increase being $950,000 over the average of the four prior years. Pointing out that the income of the second base period year (1938) was approximately $485,000 less than the preceding year,

whereas there was only a slight reduction in replacement expense during the latter year (from $48,000 to $44,000) petitioner insists it has shown that there was a "lack of causal relationship between gross income and replacements and allowance expense," especially when other evidence introduced by it is also considered. The other evidence, as inferentially appears from our findings, consisted of a showing that a substantial portion of the increase in replacement expense had resulted from defects in the anthracite burners and the "coal-flows," which had been put out chiefly after 1935, and from the securing of additional capital in the amount of $900,000 through the issuance of new stock, some of which had been used in carrying its own paper, which latter fact accounts for some of the increase in "other income."

Respondent undertook to establish through the introduction of tables, using the same basic figures as those shown upon petitioner's exhibits but arranged differently, and by cross-examination of the witnesses, what he characterized as a "lag" in the replacement expenses—i. e., that a substantial part of the sales made in one year resulted in much of the increase in replacement expense in a later year. We have not incorporated the tables prepared by him in our findings; but it is obvious that there was some "lag." Both parties also undertook to show, by dividing the sales between anthracite burners and "coal-flows" on the one hand and bituminous stokers and other products on the other, that there was, or was not, a causal connection between the increase in gross income from the sale of the latter products and the increase in replacement expense. That there was some increase in the sales of the latter and a corresponding increase in gross income from that source is clear from the following schedule:

| Year | Total sales | Sales of anthracite stokers and coal-flows | Sales of bituminous stokers and other products |
|------|------------|-------------------------------------------|-----------------------------------------------|
| 1933 | $1,991,262.99 | None | $1,991,262.99 |
| 1934 | 2,647,776.03 | None | 2,647,776.03 |
| 1935 | 3,645,186.37 | $212,922.00 | 3,432,264.37 |
| 1936 | 4,943,430.38 | 765,960.00 | 4,177,470.38 |
| 1937 | 5,279,354.21 | 1,000,554.00 | 4,278,800.21 |
| 1938 | 4,584,332.48 | 783,303.00 | 3,801,029.48 |

It is also clear that there was a substantial increase in the sales of anthracite stokers and coal-flows between 1933 and 1937.

It is true, as petitioner points out, that some of the increase in gross income resulted from using capital to carry paper on conditional or installment sales contracts and that a substantial part of the increase in replacement expense resulted from defects in the anthracite burners

and "coal-flows." We can not assume, however, even though there was some testimony to that effect, that the replacement expense on the other products remained precisely the same as it had been in the last of the years prior to the base period year or that it was the average either of the preceding four years or of the preceding ten years. We think it is fair to say, however, that the ratio appears to have been substantially the same.

Petitioner argues that respondent ignores completely the wording of the statute when he, in the preparation of some of his exhibits and in his argument bottomed thereon, refers to the sales of the various products and makes comparisons, percentagewise, of sales and replacement expense. It is true, as petitioner points out, that the provision of the applicable statute refers solely to gross income. We, however, have kept that in mind and, throughout our consideration of the issue, have assumed that gross income was used in the statute in its normal sense, i. e., as meaning net sales—gross sales less cost of sales—plus other income, *William Leveen Corporation, supra,* notwithstanding the fact that for some purposes petitioner seems to desire that gross sales be used. (Its Exhibits 2 and 3 were the basis on which the first two tables shown in our findings have been prepared.)

Proof of the essential conditions is extremely difficult and no criticism of petitioner or its counsel is intended or implied. It, in good faith, appears to have endeavored to bring forth the type of evidence suggested in *William Leveen Corporation, supra*—"proving affirmatively that the abnormal deduction is a consequence of something other than the increase in gross income and that such proven cause is the converse or opposite of an increase in gross income and could not be identified with an increase in gross income." The proof has been sufficient to show, as conceded by respondent, that some part of the increased expenditure for replacements on anthracite stokers and "coal-flows" was unrelated to an increase in gross income and sales; but, in spite of the analysis of the facts set out in petitioner's reply brief, we are of the opinion it has failed to show that none of the increase in replacement expense was attributable to an increase in the sales of bituminous stokers and other products and to show that all of the "excess" resulted from the sale of coal-flows and anthracite burners. In this connection it has been assumed, *arguendo*, that the class of deductions may thus be subdivided—a conclusion which we deliberately refrain from expressing. Moreover petitioner's argument in support of separating the two—anthracite stokers and coal-flow as one and bituminous stokers and other products as the other—for present purposes, materially weakens its contention that the last portion of the statute is not likewise an insuperable obstacle to the granting of the relief sought, as is persuasively argued by respondent. In our

judgment, however, it is unnecessary to determine whether sufficient proof has been made under that part of the statute. We merely hold that petitioner has failed to establish that some part of the excess was not a consequence of an increase in its gross income in its base period.

What has been said is dispositive of the issue. It would serve no useful purpose to review the analysis made by the parties of the figures as to which there is no dispute or to monument those relied upon by the respondent to show the alleged "lag." Comparisons with later base period years or averaging the gross income and replacement expenses over such years, as well as comparisons with years preceding those referred to in the statute as the four years prior to the base period, seem to be wholly unnecessary and not required. Such comparisons indicate, on the one hand, as respondent suggests, that increases in replacement expense were not unusual in petitioner's experience;[3] but they also indicate that there was abnormality in amount in the two base period years. The statute is designed to prevent unfair application of the tax in abnormal cases. But there is a commensurate need for restricting its application to the cases for which it was designed. (See legislative history set out in *Green Bay Lumber Co.*, *supra.*) The comparison suggested by petitioner indicates an ultimate leveling off of the replacement expense to less than one-half of one percent in 1940. That is approximately twice as much as in some of the earlier years, stated in percentage; but it is still less than it was during some of the earlier years. This, and other evidence, supports the finding we have made that the expenditures vary from year to year in a reasonably constant proportion to sales, with high points being reached in years when new models are being tried out. But the fact that these high points are abnormal does not entitle petitioner to the relief sought unless it can establish that none of the excess or abnormality was a consequence of an increase in gross income.

In its reply brief petitioner argues respondent has not shown that there had been an increase in gross income, as distinguished from gross sales, with respect to the bituminous stokers and "coal-flows." Respondent had no burden of making such proof. The burden rested upon petitioner throughout—not only because of the presumption of correctness attaching to the Commissioner's action in disallowing the claim for refund, but also because, under the statute, it must "establish" the necessary facts. As indicated above, total sales minus cost of sales is the formula usually applied for determining gross income. Throughout the five-year period 1933 to 1937, inclusive, sales, cost of sales, and income all increased in substantially the same pro-

---

[3] Note that in 1928 replacement expense had been at the rate of approximately $20,000 on each $1,000,000 of sales.

portions. Sales of products other than anthracite stokers and "coal-flows" increased and sales of the latter increased from less than 1 percent of the total to 19 percent. The assumption made by the respondent that a substantial portion of the increase in gross income resulted from an increase in the sales of bituminous stokers and products other than anthracite burners and "coal-flows" is not unjustified in the absence of proof to the contrary. Moreover the increase in the sales of the anthracite burners also tends to support his ultimate conclusion.

The conflicting views and inferences of the parties are irreconcilable. In the main those of the respondent seem to be the sounder. The burden was upon petitioner to prove that the abnormality was not a consequence of the increase in its gross income. It, in our judgment, has failed to do so. We therefore sustain the Commissioner's action in disallowing the claim for refund to the extent that it was disallowed.

*Decision will be entered under Rule 50.*