Swiss Colony, Inc., Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 2918–66.  Filed April 8, 1969.

*John L. Palmer* and *George B. Sletteland,* for the petitioner.
*Denis J. Conlon,* for the respondent.

30

32.

**34**

[redacted]

OPINION

The question for determination herein relates to petitioner's right to net operating loss deductions in 1963 and 1964 based on the net operating loss carryovers obtained on the liquidation of its subsidiary, Swiss Controls. Respondent's attack on petitioner's claimed deductions is twofold: (1) Petitioner did not succeed to Swiss Controls' net operating loss carryovers because section 381[3] was inapplicable to these loss carryovers since no valid section 332 liquidation existed due to the insolvency of Swiss Controls at the time its assets were transferred to petitioner; and (2) petitioner's claimed net operating loss deductions should be disallowed pursuant to section 269 since petitioner acquired control of Swiss Controls for the principal purpose of avoiding or evading income taxes by securing the benefit of those deductions.

### Section 381 Issue

Section 381[4] provides a comprehensive set of rules for the preservation of tax attributes, including loss carryovers, in certain cate-

---

[3] All statutory references are to the Internal Revenue Code of 1954.

[4] SEC. 381. CARRYOVERS IN CERTAIN CORPORATE ACQUISITIONS.

(a) GENERAL RULE.—In the case of the acquisition of assets of a corporation by another corporation—

(1) in a distribution to such other corporation to which section 332 (relating to liquidations of subsidiaries) applies, except in a case in which the basis of the assets distributed is determined under section 334(b)(2); or

(2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D) * * * or (F) of section 368(a)(1),

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c).

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) ITEMS OF THE DISTRIBUTOR OR TRANSFEROR CORPORATION.—The items referred to in subsection (a) are:

(1) NET OPERATING LOSS CARRYOVERS.—The net operating loss carryovers determined under section 172 * * *

gories of corporate acquisitions of assets. Included in these categories is the acquisition of assets upon the liquidation of a subsidiary under section 332.[5] Section 332(b)(2) provides that in order for a liquidation to qualify under that section, the distribution of the subsidiary must be in complete cancellation or redemption of all its stock. Thus, it has been held that section 332 is inapplicable to the liquidation of an insolvent subsidiary because in such instance there is nothing to distribute in cancellation or redemption of the liquidating corporation's stock. *Spaulding Bakeries, Inc.*, 27 T.C. 684 (1957), affd. 252 F. 2d 693 (C.A. 2, 1958); *Iron Fireman Manufacturing Co.*, 5 T.C. 452 (1945). In this regard, section 1.332–2(b), Income Tax Regs., provides:

> (b) Section 332 applies only to those cases in which the recipient corporation receives at least partial payment for the stock which it owns in the liquidating corporation. * * *

In determining whether a subsidiary is insolvent for section 332 purposes, *the fair market value*[6] of its assets is determinative. *Northern Coal & Dock Co.*, 12 T.C. 42 (1949); cf. Rev. Rul. 59–296, 1959–2 C.B. 87; Rev. Rul. 68–602, 1968–2 C.B. 135. Thus, if the fair market value of a corporation's assets exceeds the amount of its liabilities, the corporation is solvent, and the recipient corporation, which received all of the assets of the liquidating corporation subject to its liabilities, has received payment for the stock which it owned in the liquidating corporation, within the meaning of section 1.332–2(b), Income Tax Regs. Cf. Rev. Rul. 68–359, 1968–2 C.B. 161.

Petitioner's right to the net operating loss carryovers herein thus hinges on the solvency *vel non* of Swiss Controls at the time it transferred its assets subject to its liabilities to petitioner.[7] It is our opinion that Swiss Controls was solvent at that time.

In the instant case, this Court is faced with a situation where both respondent and petitioner ascribe unrealistic value to the assets in

---

[5] SEC. 332. COMPLETE LIQUIDATIONS OF SUBSIDIARIES.

(a) GENERAL RULE.—No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation.

(b) LIQUIDATIONS TO WHICH SECTION APPLIES.—For purposes of subsection (a), a distribution shall be considered to be in complete liquidation only if—

(1) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends); and * * *

(2) the distribution is by such other corporation in complete cancellation or redemption of all its stock, and the transfer of all the property occurs within the taxable year * * *

[6] "Fair market value" has been defined as "the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy nor sell and both being reasonably informed [as to all relevant facts]." *O'Malley* v. *Ames*, 197 F.2d 256 (C.A. 8, 1952); see generally 10 Mertens, Law of Federal Income Taxation, sec. 59.01.

[7] Swiss Controls upon liquidation also distributed cash in the amount of $1,964.28; in aggregate to its minority stockholders (1 percent).

dispute. Under such circumstances, our already difficult task is made all the more burdensome. As the Court of Appeals stated in *Colonial Fabrics* v. *Commissioner*, 202 F.2d 105, 107 (C.A. 2, 1953), affirming a Memorandum Opinion of this Court:

For finding market value is, after all, something for judgment, experience, and reason on the part of the trier, and does not lend itself to dissection and separate evaluation.

Nevertheless, in our exercise of this judgment, experience, and reason, we are led to the conclusion that the fair market value of Swiss Controls' assets, while perhaps not worth the $511,000 ascribed thereto by petitioner, certainly was greater than its $24,684.17 of liabilities.[8]

As regards Swiss Controls' tangible assets, i.e., inventory, machinery, and equipment, petitioner presented testimony by its accountant that the net liquidating value of these tangible assets was $47,000. In addition, a Swiss Controls employee testified that the machinery and equipment was in excellent condition and had a fair market value of approximately $22,000 to $25,000. Although this figure may be somewhat optimistic, we think petitioner has established that the machinery and equipment had an appreciable value on the date of liquidation.

Swiss Controls' most important category of assets was its patents and patent applications. Petitioner contends that the fair market value thereof was $425,000. Respondent, on the other hand, argues that those items were so speculative in value that no fair market value could be assigned to them as of December 31, 1962. We think their true value lies somewhere between these two extremes. Petitioner presented the testimony of Clarence Seaton, an engineer in the employ of Swiss Controls up to September 1962, to the effect that the patents and patent applications relating to various devices being worked on by Swiss Controls during 1962 had fair market values totaling $425,000. We cannot accept the accuracy of these valuation figures as the witness's testimony was vague and largely lacking in supporting facts. However, certain other evidence leads us to conclude that at least some of Swiss Controls' patents and patent applications did have market value.

The Koerper Report, a product and market evaluation of Swiss Controls, conducted by an independent engineer, recognized that at least one of the Swiss Controls' patent applications, the pressure control system, was "significant" and "could be quite valuable." Also, subsequent to the date of the Koerper Report, on November 27, 1962, a patent application for a calorimeter was filed by two Swiss Controls

---

[8] Respondent suggests that the liabilities of Swiss Controls were higher than the figure on the balance sheet because of $22,500 of alleged "loans" to the company by Kubly and Koch, two of its stockholders. However, we are convinced that these amounts were contributions to capital and not loans by the two stockholders.

employees. The rights to this device were received by petitioner on the liquidation of Swiss Controls and later transferred to a new corporation, Swiss Controls—Illinois. Thereafter, in 1964, an unrelated investor purchased 50-percent ownership of Swiss Controls—Illinois for $50,000. In 1965, a patent was issued on the calorimeter. On the basis of the above evidence, it is our opinion that the patents and patent applications of Swiss Controls, principally the pressure control system and the calorimeter, had some fair market value on December 31, 1962, and applying the principles of *Cohan* v. *Commissioner*, 39 F.2d 540 (C.A. 2, 1930), we attribute a value thereto of at least $40,000. Cf. *J. T. Slocomb Co.*, 38 T.C. 752 (1962), affd. 334 F.2d 269 (C.A. 2, 1964).

Our conclusion that Swiss Controls was solvent on its liquidation is supported by a written offer by First Electronics Corp. to purchase all the stock of Swiss Controls for $108,000, made on December 10, 1962. Although we recognize the somewhat tenuous nature of this type of proof, we think the offer tends to show that the business and assets of Swiss Controls were considered to be of at least some value in the market place.

Repondent submits a series of arguments aimed at lessening or eliminating the effect of petitioner's evidence concerning the fair market value of Swiss Controls' assets. While some of respondent's points are well taken, viewing the evidence as a whole, we are left with the conviction that while Swiss Controls was not in robust financial health, it was not quite as indigent as respondent would have us believe. On its liquidation it had assets, both tangible and intangible, of a combined value greater than its liabilities, and petitioner received this excess in value as payment for its stock in Swiss Controls.

We therefore hold that a valid section 332 liquidation did occur and that section 381 is applicable to permit petitioner to succeed to and take into account Swiss Controls' net operating loss carryovers.

### Section 269 Issue

Respondent alternatively contends that regardless of the applicability of section 381, the net operating loss deductions claimed by petitioner must be disallowed under section 269 [9] since petitioner acquired

---

[9] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.
  (a) IN GENERAL.—If—
    (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation * * *

    \*        \*        \*        \*        \*        \*

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation,

control of Swiss Controls for the principal purpose of evading or avoiding the Federal income tax by securing the benefit of those deductions.

Respondent's contention is presumptively correct and the burden of proof is on petitioner to show that respondent's determination was erroneous. *American Pipe & Steel Corporation*, 25 T.C. 351 (1955), affd. 243 F. 2d 125 (C.A. 9, 1957). Indeed, it appears that the basic facts herein establish a prima facie case of a principal purpose of tax avoidance. Sec. 1.269–3(b)(1), Income Tax Regs.[10]

In response, petitioner asserts that its acquisition of control of Swiss Controls was brought about by its repossession of 107,250 shares of that corporation's stock pursuant to the terms of. the sale contracts covering that stock;[11] that the purpose of the repossession was the protection of petitioner's position as creditor under those sale contracts; and that the purchase of the remaining 70,000 shares of stock from Northwest and BCC occurred after petitioner had acquired control of Swiss Controls and thus was not subject to the provisions of section 269. We cannot accept petitioner's arguments.

Petitioner's position is bottomed upon the factual determination that the repossession preceded in time[12] and was independent from the purchase of stock from Northwest and BCC. Such a view, we think, represents petitioner's unrealistic attempt to segregate into isolated segments a course of conduct which was essentially unitary both in conception and impact. We are of the opinion that both transactions were part of a single plan intended to achieve 80-percent "control" of Swiss Controls in petitioner, so that it could avail itself of section 332 and therefore fall within the provisions of section 381.[13] The repossession of the 107,250 shares of stock gave petitioner only 73.05-percent ownership of Swiss Controls. Thus, the purchase of at least some of the stock outstanding in the hands of Northwest and BCC was neces-

---

[10] Sec. 1.269–3(b) *Acquisition of control; transactions indicative of purpose to evade or avoid tax.* If the requisite acquisition of control within the meaning of paragraph (1) of section 269(a) exists, the transactions set forth in the following subparagraphs are *among those which,* in the absence of additional evidence to the contrary, ordinarily are indicative that the principal purpose for acquiring control was evasion or avoidance of Federal income tax.

(1) A corporation or other business enterprise (or the interest controlling such corporation or enterprise) with large profits acquires control of a corporation with current, past, or prospective credits, deductions, net operating losses, or other allowances and the acquisition is followed by such transfers or other action as is necessary to bring the deduction, credit or other allowance into conjunction with the income * * *

[11] Petitioner makes no argument that the repossession did not constitute an "acquisition" for the purposes of sec. 269. It argues only that the repossession was not made with the purpose proscribed by that section. The respondent having determined that the repossession did constitute an "acquisition" under sec. 269 and petitioner having in effect agreed, we so treat the repossession, but do not decide the question.

[12] It is petitioner's contention that its acquisition of Swiss Controls stock by repossession occurred in May, June, and August 1962, when the defaults occurred, and not on Dec. 26, 1962, when the stock was formally repossessed. We need not decide this point, however, in light of our conclusion that the repossession and purchase were not independent transactions.

[13] See p. 34 fn. 4, *supra.*

sary for petitioner to succeed to Swiss Controls' net operating loss carryovers. Petitioner was cognizant of this fact, and we think it flies in the face of reality to conclude that petitioner acquired greater than 50-percent control of Swiss Controls by repossession of the defaulted stock and then independently purchased the additional stock necessary to give it greater than 80-percent control thereof. Rather, in our view, petitioner, pursuant to a single plan, acquired by means of both repossession and purchase, that degree of control (over 80 percent) necessary for it to accomplish its objective of obtaining Swiss Controls' net operating loss carryovers. Cf. *Temple Square Mfg. Co.*, 36 T.C. 88 (1961).

The unitary nature of petitioner's repossession and purchase of Swiss Controls stock is evidenced by petitioner's delay in formally repossessing the defaulted stock. Although the defaults occurred in May, June, and August of 1962, yet petitioner waited until December 26, 1962, after it was clear petitioner would be able to purchase (or already had purchased) the remaining shares of Swiss Controls, to formally repossess the defaulted stock.[14] Under these circumstances, we hold that the repossession and purchase were both part of an integrated arrangement whereby petitioner acquired control of Swiss Controls for purposes of section 269, and that petitioner has failed to establish that such acquisition of control was not for the principal purpose of evading or avoiding the Federal income tax.

Even though we were to agree with petitioner that the repossession constituted an independent transaction, prior in time to the purchase, resulting in the acquisition of control of Swiss Controls for purposes of section 269, we would be unable to agree with its further contention that this acquisition was not tax motivated. In our view, the record viewed in the manner most favorable to petitioner, establishes at most that there were two purposes of some significance in its repossession of the Swiss Controls stock—a business purpose to protect its creditors' position and a tax-avoidance purpose to act as the first step in obtaining Swiss Controls' net operating loss carryovers. For petitioner to prevail, however, it must establish by a preponderance of the evidence, that tax avoidance was not the principal purpose of the acquisition of control of Swiss Controls. *J. T. Slocomb Co.*, *supra; Hawaiian Trust Company Limited* v. *United States*, 291 F.2d 761 (C.A. 9, 1961). This it has failed to do.

---

[14] The fact that the formal repossession and the purchase of the Swiss Controls stock occurred in late December points up anew the tax advantages inherent in the entire arrangement. Under sec. 381(c)(1)(B), only a proportionate part of petitioner's taxable income (computed on a daily basis) for 1962 could have been offset by a net operating loss deduction attributable to Swiss Controls' loss carryover. Thus, petitioner's delay in obtaining 80-percent control of Swiss Controls and the concomitant delay in liquidating under sec. 332 produced the greatest possible tax advantage to petitioner from Swiss Controls' net operating loss carryovers.

Judicial ascertainment of the subjective purpose which motivated particular actions is frequently difficult. However, our analysis of the entire record leads us to the conclusion that petitioner has failed to establish that tax avoidance was *not* the principal purpose involved in its acquisition of control of Swiss Controls, whether this acquisition be viewed as consisting of the repossession and purchase as an integrated arrangement, or the repossession and purchase as separate and independent transactions. Cf. *Luke* v. *Commissioner*, 351 F.2d 568 (C.A. 7, 1965), affirming a Memorandum Opinion of this Court; *Temple Square Mfg. Co., supra.* Therefore, we hold that section 269 is applicable to disallow petitioner's net operating loss deductions in 1963 and 1964.

Reviewed by the Court.

*Decision will be entered for the respondent.*

———

TANNENWALD, *J.*, concurring: I agree that section 269 cuts across section 381 and that it serves a useful purpose for the Court as a whole to formalize this principle, which has thus far only been assumed or implied in the decided cases.

Whether this case fits the mold of section 269 is a more difficult question. I have serious doubts that the cancellation of the agreements with the employees meets the requirement *of control* within the intendment of section 269(a)(1). It may well be that, because of the employer-employee relationship, the substantial unpaid purchase price, and the absence of personal liability on the part of the employees to make payment, the agreements never deprived petitioner of the requisite control. However, since the petitioner did not argue this issue (see fn. 11 to the majority opinion), there is no need for us to resolve it.

As I read the majority opinion, the timing of the repossession of the employees' shares and of the purchases from Northwest and BCC does not per se require the conclusion that the proscribed purpose under section 269 existed, but is merely one fact to be taken into account in evaluating whether the principal purpose of these acquisitions was "evasion or avoidance of Federal income tax." On this issue, therefore, the majority decision merely reflects an ultimate finding of fact by the trial judge based on his determination of the relative weight to be given to the various factual elements involved. Accordingly, I concur in that decision, although I, myself, might well have been inclined to accord different relative weight to those elements and to make a contrary determination.

DRENNEN, FORRESTER, FAY, FEATHERSTON, and STERRETT, *JJ.*, agree with this concurring opinion.