Scroll, Inc., a Florida corporation v. Commissioner.
Scroll, Inc. v. Commissioner
Docket No. 4168-67.
United States Tax Court
T.C. Memo 1969-154; 1969 Tax Ct. Memo LEXIS 141; 28 T.C.M. (CCH) 768; T.C.M. (RIA) 69154; July 22, 1969, Filed Richard J. Horwich, for the petitioner. Richard G. Holloway, for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency of $266,651.95 in the income tax of petitioner for the fiscal year ending July 31, 1962. Due to concessions by both parties, the only issue that remains is whether petitioner is entitled to a net operating loss carryforward deduction in 1962. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein by this reference. Scroll, Inc. (hereinafter referred to as Scroll or petitioner), a Florida *143 corporation, had its principal place of business in Dade County, Florida, at the time its petition was filed herein. Scroll's corporate income tax return for its fiscal year ended July 31, 1962, was filed with the district director of internal revenue at Jacksonville, Florida. Scroll, a wholly owned subsidiary of Miami Window Corporation (hereinafter referred to as Window), was incorporated in 1957 for the purpose of engaging in the business of designing, manufacturing and selling aluminum and other metal furniture and other products. In June 1959, as a consequence of Window's serious financial condition and its poor management, Robert Russell (hereinafter referred to as Russell), Window's majority shareholder, assumed control of Window. Russell set about restoring the company's financial health. One means he resorted to was the systematic disposal of Window's unprofitable operations. At this time Scroll was a loss corporation; it continued to suffer monthly losses after Russell assumed control. Russell discovered that Scroll's executive staff had been guilty of defalcations, false travel and entertainment expenses and other corporate waste. Russell cleaned out Scroll's old management. *144 Around March 1960, he obtained the consulting service of Solomon Raduns (hereinafter referred to as Raduns), who had come to Florida to retire. Raduns had been engaged in the metal furniture business in New York City for thirty-five years including ten years during which he was engaged exclusively as general manager of an aluminum furniture business. After a three months' study of Scroll's operations, Raduns advised Russell that Scroll had promise of becoming profitable. Russell employed Raduns as general manager of Scroll. This was around June 1960. As general manager, Raduns eliminated Scroll's unprofitable lines and raised the prices on those remaining. Under its old management, Scroll had acquired a reputation for poor craftsmanship; its welding did not hold up; its webbing techniques and painting were unsatisfactory. As a consequence of these defects, carloads of furniture were being returned to Scroll. Scroll had also acquired a reputation for broken 769 promises and late delivery. Despite its defects, Scroll's funiture remained in high favor in the trade because of its appearance and style. As a result of Raduns' efforts to overcome its shortcomings, Scroll began to show *145 monthly profits in the spring of 1961. In the meantime, Russell continued to be engaged in his rehabilitation of Window. In this regard, in March or April 1961, he discussed with representatives of Air Control Products, Inc. (now known as Keller Industries, Inc., and hereinafter referred to as Keller Industries) the sale of Scroll to that company. Keller Industries was a publicly held corporation engaged in the manufacture and sale of aluminum windows, sliding patio doors and screens; its affiliated controlled corporations manufactured tub and shower enclosures, porch, patio and pool enclosures, kitchen cabinets, aluminum extrusions, wool and nylon carpeting, aluminum ladders and plastic products. Henry A. Keller (hereinafter referred to as Henry Keller) was the controlling stockholder of Keller Industries. Russell knew Henry Keller personally. In 1959, when Russell discovered the financial condition of Window, of which he was the controlling stockholder, he had discussed with Henry Keller the sale of Window as a whole, including its subsidiaries, to Keller Industries. At that time, Russell thought Keller Industries would be in a better position than he to rehabilitate Window. On *146 this occasion, Henry Keller visited Scroll's plant in Miami, Florida. The sale of Window as a whole did not materialize. In March or April 1961, when Russell approached Keller Industries concerning its purchase of Scroll, alone, Scroll had turned around and had achieved a monthly profit of $1,000. Henry Keller and Monroe Cooperman, executive vice president of Keller Industries, by coincidence were already familiar with Scroll's wrought aluminum furniture which they had in their homes. Their wives liked the furniture and visitors to their homes had admired it. In May 1961, Keller's representatives visited Scroll's plant where they met Raduns who assured them he would remain with Scroll following its purchase by Keller Industries. Prior to this time, Scroll had made substantial efforts to give its name special significance in the solid aluminum furniture business. Design engineers had been engaged. The furniture was shown at various furniture stores and in Scroll's showrooms around the country. Advertising space was used extensively in magazines and newspapers. Scroll had advertised cooperatively with stores handling its lines. Trademarks and design patents were secured. The following *147 expenditures had been made during prior years: Travel and entertainment
$ 29,056.98
Advertising
189,221.22
Development Expense (expenditures of an experimental or developmen- tal nature not directly chargeable to production for sales)
54,452.15
Amortization of dies and jigs 15,934.75
Total
$288,665.10
At the first discussion between Russell and Keller's representatives in March or April, Russell stated Window would settle for nothing less than the net book value of Scroll's assets, including improvements, betterments and intangibles. Subsequently, around June or July 1961, Keller Industries agreed to purchase all the stock of Scroll for the net book value of its assets as determined by audit. This audit was conducted and the book value of the assets, as stated by Russell earlier, was confirmed with only a minor adjustment. On October 31, 1961, Window sold all of Scroll's stock to Keller Industries for $235,256.80, based upon the book value of the net assets of Scroll as of September 30, 1961. The sale was backdated to July 31, 1961. During the course of early discussions in the spring of 1961, Russell had mentioned the possibility of an arrangement for *148 deferred payment of the purchase price. He believed he could induce Revere Copper and Brass, Inc. (hereinafter referred to as Revere), a supplier and major creditor of Window, and a supplier of Keller Industries, to accept the latter's note against the amount, which exceeded $200,000, that Window owed Revere. Revere agreed to this. The cash that Window would have used to satisfy its debt to Revere became available to Window for the purchase of its outstanding bonds. Window had issued $3,500,000 in debentures in 1959 by public offering. The subsequent release of financial statements and the resultant publicity of Window's poor financial condition resulted in the sale of these bonds at substantial discounts. In the spring of 1961, Russell believed that Window could purchase a substantial block of these bonds at a 65 percent discount from face. The bonds carried a fixed interest cost of 6 1/2 percent. Accordingly, Russell estimated the cash generated from the sale of Scroll would enable Window to eliminate approximately $700,000 worth of debentures and a fixed interest cost of about $42,000 a year. Russell decided the elimination of so substantial an amount of 770 debt and its interest *149 charge would be more advantageous to Window than the possibility of Scroll's achieving near-term profits that would offset the interest charge alone. It was this consideration that induced him to sell Scroll, which he did with reluctance. The purchase price was paid as follows: Assignment to Window of certain accounts receivable on Scroll's books
$ 15,861.40
Promissory note dated October 31, 1961 and due April 30, 1963, with- out interest 219,395.40
Total
$235,256.80 The note, assigned to Revere, was paid in full by Keller in April 1963. After its acquisition by Keller Industries, Scroll's business of manufacturing solid aluminum furniture continued without substantial change. Raduns continued on and is still employed as general manager in charge of Scroll's plant in Miami. Scroll's factory superintendent and its accountant and office manager have remained. No changes were made in Scroll's accounting procedures except its books were transferred to Keller Industries. Scroll has benefited by its affiliation with Keller Industries. Keller Industries had purchasing representatives in Europe and in Japan. After its acquisition, Scroll purchased aluminum castings *150 from Japan at prices that were 30 percent lower than the prices it had been paying for similar castings in this country. Keller Industries' economic strength benefited Scroll's distribution and sales. It enabled Scroll to open two main showrooms of its own in New York and in Chicago. These showrooms, which were rented, were run by Scroll rather than by a commissioned representative. Keller Industries' financial help also enabled Scroll to expand its advertising with expensive advertisements and brochures which previously could not have been afforded. On January 31, 1962, Aluminum Chair Products, Inc., a Florida corporation incorporated in 1960 as a wholly owned subsidiary of Keller Industries, engaged in the manufacture of tubular aluminum furniture at Waynesboro, Georgia, was merged into Scroll pursuant to the Florida corporation law. The stock of Chair was canceled, after which Keller owned 100 percent of the stock of Scroll, the surviving corporation. After the merger, the tubular aluminum furniture business at Waynesboro, and the wrought aluminum furniture business at Miami, Florida continued to operate, much as before, as divisions of the surviving Scroll corporation. These *151 operating divisions were known, respectively, as the Aluminum Chair Products Division and the Scroll Division. The Chair Products Division and the Scroll Division have continued to maintain separate plants. The Chair Products Division manufactures a limited variety of tubular aluminum furniture, principally chairs, rockers and chaise lounges. This furniture is made of lightweight aluminum tubing bent into forms which are screwed or riveted together and covered with an inexpensive woven material. The furniture is mass-produced by a highly mechanized process. The furniture is cheap and normally wears out after one or two years. While it is manufactured for outdoor use, it may be used indoors by people who cannot otherwise afford indoor furniture. It is not notable for its styling or design. It is sold in regular furniture stores. The Scroll Division manufactures numerous lines of highly styled wrought aluminum furniture, consisting principally of sofas, chairs and tables for indoor and outdoor use. The wrought aluminum furniture is made out of an aluminum alloy that is heavier and stronger than that employed in the tubular aluminum furniture. Readymade extrusions of a water-quenched *152 and hardened aluminum alloy are purchased and welded together by skilled craftsmen. The Scroll Division employs about 65 persons, most of whom are highly skilled. The chair seats are cushioned and are covered in flower-patterned or otherwise decoratively colored fabrics, including vinyl. The wrought aluminum furniture, once guaranteed against rust for a hundred years, is long lasting. It is stylishly designed. This decorative furniture has won awards for its styling and design. The wrought aluminum furniture manufactured by the Scroll Division is advertised in brochures and in such magazines as House and Garden. Colored photographs display the different designer collections of Scroll wrought aluminum furniture. The collections are shown in appealing home settings, both indoor and outdoor, often with attractive models. The furniture can be ordered in a wide variety of metal finishes and fabric selections. The brochures are circulated by interior decorators, or they can be obtained at Scroll's showrooms. Requests for the Scroll brochure are 771 solicited in magazine advertisements. The tubular aluminum furniture is advertised in less expensive advertisements in magazines and newspapers. *153 The advertisements for wrought aluminum furniture project an image that is totally disassociated from the lower cost tubular aluminum furniture manufactured at Waynesboro. The two types are not advertised together. The wrought aluminum furniture is displayed in Scroll's showrooms in several major cities. The tubular aluminum furniture is sold in ordinary furniture stores. There is no evidence that the Chair Products Division's sales of tubular aluminum furniture benefited substantially from its association with the name "Scroll." Through the efforts of Robert Crockett (hereinafter referred to as Crockett), the chief executive of Aluminum Chair Products, Scroll obtained a color page in the Sears Roebuck catalogue advertising its solid aluminum furniture. Crockett facilitated the distribution and sale of Scroll's solid aluminum furniture through his contacts with other retail stores. Crockett, as well, had been a business acquaintance of Raduns while the latter had been engaged in the aluminum furniture business in New York. On September 29, 1961, prior to the merger of Aluminum Chair Products, Inc. and Scroll, Monroe Cooperman received a letter from Richard Horwich, an attorney, *154 concerning the Georgia income tax on Aluminum Chair Products, Inc. The letter advised of a method of allocating the corporation's income to sources that were not subject to the state tax. The letter advised that this allocation was available, however, only to corporations whose income resulted in part from property in another state or in part from carrying on business in another state. The letter advised further that the mere shipment of goods to points outside of Georgia did not constitute doing business outside of Georgia. However, such sales might be considered non-Georgia sales for purposes of allocation of income to non-Georgia sources if the corporation otherwise qualified for such allocation. Subsequently, on December 20, 1961, Richard Horwich again wrote Monroe Cooperman concerning the Georgia income tax on Aluminum Chair Products, Inc. The substance of this second letter was as follows: From discussions with you and Don Casson about our letter to you of September 29, 1961, it appears that Aluminum Chair Products, Inc. has not maintained any operations outside of the State of Georgia which would entitle it to use the system of allocating sales. We suggest that you consider *155 methods that would entitle you to allocate sales for the purposes of the Georgia income tax. Earlier this year, Air Control acquired a subsidiary which is also in the aluminum chair business and which has a factory and main office in Florida. We refer, of course, to Scroll, Inc. We suggest that you seriously consider combining these two operations as soon as possible in order to achieve the right to allocate sales for the purposes of the Georgia income tax. We think that the action could be done most effectively, with respect to the outlook of the Georgia taxing authorities, by combining Aluminum Chair Products' operation into that of Scroll, Inc. rather than by attempting to alter the operation of Aluminum Chair Products, Inc. by adding the operations of Scroll, Inc. This would also help to preserve the existence and name of Scroll, Inc., which we understand has a very high prestige in the field. Please give this your consideration and advise us. We feel that a statutory merger could be conveniently effected at the next appropriate accounting date. Scroll had, as of July 31, 1962, an accumulated net operating loss of $596,799.15 computed as follows: Taxable Year Ended
Loss
2/28/58
$ 1,362.03
2/28/59
299,630.96
2/28/60
241,796.11
2/28/61 55,654.74
Total Losses
$598,443.84
Less: Profit for period 3/1/61 * -7/31/61 1,644.69
$596,799.15
*156 Prior to its purchase of Scroll's stock, Keller's management was aware of Scroll's accumulated net operating loss. The price Keller paid for Scroll's stock was less than the total of the book value of the assets acquired plus the potential tax benefit derived from the losses of petitioner, as shown by the following computation: Book value of assets acquired ($235,256.80-$15,861.40)
$219,395.40
Potential tax benefit of net operating loss ($596,799.15 at 52%) 310,335.56
Total assets and benefits acquired $529,730.96
Percentage of cost to assets and potential tax benefits acquired
41.42% 772 The primary purpose of the merger of Scroll with Aluminum Chair Products was to obtain the benefit of Scroll's net operating loss carryforward deduction as a deduction against the post-merger income of the continuing corporation. This merger was planned during the negotiations between *157 Keller Industries and Window prior to their reaching a final agreement for Keller Industries' acquisition of Scroll. Scroll's post-acquisition net income from its solid aluminum furniture business before income taxes has been as follows: Year EndedJuly 31
Net Income before deduc- tion of amounts reflecting in- terest and management fees allocable to Keller Industries
Net Income After deduc- tion of amounts reflecting in- terest and management fees allocable to Keller Industries
1962
$ 34,954
$ 13,499
1963
46,897
28,436
1964
55,937
28,471
1965
94,175
83,733
1966
83,466
70,647
1967
91,269
75,905
1968
120,131
98,524
Prior to its merger with Scroll, Aluminum Chair Products was a profitable corporation with sales for its first two years of operations as follows: July 31, 1960
$ 966,117
July 31, 1961
$4,001,548
The post-merger net sales of the Chair Products Division and of the Scroll Division and the Scroll Division's approximate percentage of the combined net sales of both divisions have been as follows: Fiscal Year EndedJuly 31
Chair ProductsDivision
Scroll Division
Scroll Division'sPercent ofCombined netsales
1962
$5,318,893
$ 538,658
9.2%
1963
5,859,102
549,985
8.6%
1964
7,397,575
664,127
8.2%
1965
7,425,258
756,151
9.2%
1966
6,272,595
841,048
11.8%
1967
6,368,824
859,605
11.9%
1968
6,128,171
1,086,083
15.1%
*158 In Scroll's return for the fiscal year ended July 31, 1962, its net operating loss carryover of $596,799.15 was deducted from the combined profits of $976,641.00 from the Aluminum Chair Products Division (tubular aluminum furniture) and $34,954.25 from the Scroll Division (solid aluminum furniture). In his statutory notice of deficiency the Commissioner disallowed this deduction with the explanation that Scroll had not established that it was entitled to such a deduction citing sections 172, 269 and 382 of the Internal Revenue Code of 1954. Opinion Section 172 of the Internal Revenue Code of 1954[1] provides there shall be allowed as a deduction for the taxable year an amount equal to the aggregate net operating loss carryovers to such year. Scroll and Aluminum Chair Products, as commonly owned subsidiaries of Keller Industries, entered into a statutory merger in which Scroll, the continuing corporation, acquired the assets of Aluminum Chair Products. Scroll seeks to deduct its net operating loss carryover of $596,799.15, incurred prior *159 to its acquisition by Keller Industries, from the combined profits of $976,641 from the Aluminum Chair Products Division and $34,954.25 from the Scroll Division. Section 269(a)[2] provides a statutory limitation on the deductibility of loss carryovers in the circumstance where a person or persons acquire control of a corporation and the principal purpose for which such acquisition was made is the avoidance of Federal income tax by securing the benefit of a deduction which such person or corporation would not otherwise enjoy. In that circumstance, the secretary or his delegate may disallow such deduction. The Commissioner has disallowed the deduction of Scroll's net operating loss under section 269(a) in accordance with his determination that Keller Industries acquired control of Scroll for "the principal purpose" of obtaining the benefit of Scroll's loss carryforward deduction. Congress intended section 269 to "be operative only if the evasion or avoidance purpose outranks, or exceeds in *160 importance, any other one purpose." S. Rept. No. 627, 78th Cong., 1st Sess., reprinted in 1944 C.B. 973, 1017. Similarly, the Income Tax Regulations, section 1.269-3 (a)(2), provide: 773 If the purpose to evade or avoid Federal income tax exceeds in importance any other purpose, it is the principal purpose. This does not mean that only those acquisitions fall within the provisions of section 269 which would not have been made if the evasion or avoidance purpose was not present. * * * *161 The regulations further provide, in section 1.269-3(a)(2): The determination of the purpose for which an acquisition was made requires a scrutiny of the entire circumstances in which the transaction or course of conduct occured, in connection with the tax result claimed to arise therefrom. We include in the circumstances of the acquisition which are subject to our scrutiny the subsequent merger of petitioner with Aluminum Chair Products, Inc. We find the acquisition and merger constituted a single course of conduct by which Keller Industries sought to secure the benefit of Scroll's accumulated net operating loss as a deduction against the post-merger income of Aluminum Chair Products' profitable business. The essential question remains: Was this "the principal purpose" of the acquisition? We appreciate that there is testimony that Keller Industries had non-tax business purposes for making this acquisition. Keller Industries was presented with the opportunity to acquire Scroll without any immediate cash outlay. The note it gave Window, which was assigned to Revere Copper and Brass, bore *162 no interest and was not due until April 30, 1963. The purchase price of $235,256.80, equal to the net book value of Scroll's assets, was fully justified apart from any considerations of possible tax benefits. Scroll's wrought aluminum furniture was in high favor in the trade. Its earlier losses appeared to be the consequence of poor management rather than of any inherent deficiency in its product. After a year under Raduns' management Scroll appeared to be on the upswing. Henry Keller and Monroe Cooperman were both familiar with Scroll's wrought furniture which they had in their own homes, and which they found, apparently, much to their liking. In addition, Scroll had expended several hundred thousand dollars in advertising and had made other expenditures to give the name "Scroll" special significance in the aluminum furniture business. On the other hand, we have found that the representatives of Keller Industries were aware of the potential tax benefit to be derived from the transactions. We have found that the acquisition and merger constituted a single course of conduct the primary purpose of which was to employ to the fullest extent possible Scroll's net operating loss carryforward *163 against the income of Keller's profitable subsidiary. We observe, too, that Keller Industries realized at the end of its first taxable year following the acquisition, an ecomonic benefit in an amount exceeding $300,000 in terms of the resultant savings in Federal taxes to its wholly owned subsidiary Scroll. This benefit constitutes the principal benefit of the acquisition. It came about as the result of the merger of Scroll and Aluminum Chair, which merger took place hard on the heels of the acquisition by Keller of the Scroll stock. The crux of section 269 is the forbidden subjective state of mind, a fact not susceptible of direct proof. On the state of the evidence in this case, we find that the tax avoidance purpose in fact exceeded in importance any of the other alleged purposes for the acquisition. [3]That the acquisition would probably have been consummated in the absence of the tax avoidance motive is not determinative. Income Tax Regs., section 1.269-3(a)(2). *164 As we said in Swiss Colony, Inc., 52 T.C. 25, at p. 38: Indeed, it appears that the basic facts herein establish a prima facie case of a principal purpose of tax avoidance. Sec. 1.269-3 (b)(1), Income Tax Regs.[4]
*165 Here Keller, which controlled Aluminum Chair Products, Inc. (a corporation with profits), acquired control of Scroll (a corporation with net operating losses). This acquisition was soon followed by Keller 774 merging Chair into Scroll, thereby bringing Scroll's operating losses "into conjunction with the income" of Chair. This certainly neatly fits sec. 1.269-3(b)(1) quoted in footnote 4, and we think that under the facts of this case the petitioner has failed to carry its burden of proving the Commissioner's determination to be erroneous. Despite petitioner's arguments we believe this bringing of losses into conjunction with earnings was the principal purpose of the acquisition. If it had not been, Keller could well have continued operating both Scroll and Chair as separate subsidiaries. Accordingly, we uphold the Commissioner's determination that Scroll is not entitled to the claimed net operating loss carryforward. [5]
*166 Footnotes
*. Prior to its purchase by Keller, Scroll's taxable year ended on the last day of February. Scroll filed a return for the partial year ending July 31, 1961. After its purchase by Keller, Scroll's taxable year ended on July 31. This is the tax year employed by Keller on a whore.↩
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.↩
2. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General - If - (1) any person or persons acquire, * * * directly or indirectly, control of a corporation, * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. * * *↩
3. Accordingly, we do not find it necessary to rely on the statutory presumption created by section 269(c). See H. F. Ramsey Co., 43 T.C. 500, at 517↩ (1965).
4. Sec. 1.269-3(b) Acquisition of control; transactions indicative of purpose to evade or avoid tax. If the requisite acquisition of control within the meaning of paragraph (1) of section 269(a) exists, the transactions set forth in the following subparagraphs are among those which, in the absence of additional evidence to the contrary, ordinarily are indicative that the principal purpose for acquiring control was evasion or avoidance of Federal income tax. (1) A corporation or other business enterprise (or the interest controlling such corporation or enterprise) with large profits acquires control of a corporation with current, past, or prospective credits, deductions, net operating losses, or other allowances and the acquisition is followed by such transfers or other action as is necessary to bring the deduction, credit or other allowance into conjunction with the income * * *↩
5. The Commissioner has argued in the alternative that section 382 bars the operating loss carryforward deduction. Because of our holding that section 269 bars the deduction, it becomes unnecessary to determine whether the deduction must also be disallowed under section 382(a). Neither the Commissioner nor the petitioner have argued or relied on the provisions of section 382(b) which place a limitation on the carryover of net operating losses in the case of certain reorganizations. Nor does the Commissioner argue or rely on the judicial doctrine of Libson Shops v. Koehler, 353 U.S. 382 (1957). Section 269(b) authorizes the Commissioner, in any case to which section 269(a) applies, to allow as a deduction any part of any amount disallowed by section 269(a), if he determines that such allowance will not result in the avoidance of Federal income tax for which the acquisition was made. It would appear that the allowance of Scroll's operating loss carryforward to the extent of $34,954.25, the income of the Scroll Division, would not result in the avoidance of Federal income tax for which the acquisition was made, i.e., the deduction against the income of the Aluminum Chair Products Division. As this issue has not been raised by either of the parties, however, we do not consider it. Decision will be entered under Rule 50. ↩